IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

AMBASE CORPORATION,            )
                               )
            Plaintiff,         )
                               )
    v.                         )        Case No. 3:08CV651-WWE
                               )
UNITED STATES OF AMERICA,      )
                               )
            Defendant.         )

DEFENDANT UNITED STATES' MEMORANDUM
IN SUPPORT OF ITS MOTION TO DISMISS

Defendant United States of America submits this memorandum in support of its motion to dismiss this civil action for lack of jurisdiction because the United States has not waived its sovereign immunity.

QUESTIONS PRESENTED

Jurisdiction over an action for a refund of taxes requires that there have been a timely filed claim for refund raising the issue the plaintiff seeks to raise in the action.  Two questions are presented by this motion:

(1)     Under § 6511(d)(1) of the Internal Revenue Code, a claim for refund is timely if it claims that a refund is due on account of a specific debt that went bad and was not included in the original return as long as it is filed within seven years of the original return.  Plaintiff did not claim that a refund is due on account of a specific debt that went bad.  Can Plaintiff rely upon § 6511(d)(1) of the Internal Revenue Code to establish jurisdiction?

(2)     Jurisdiction can also be established if the Plaintiff can establish that, within three

years of the filing of the relevant return, it filed a formal or informal claim for refund raising the issue sought to be litigated.  Plaintiff cannot establish that, within three years of the filing of its 1992 tax return in 1993, it filed a claim for refund raising the issue of whether a tax refund can be based on a change in the estimated amount to be included in its 1992 reserve for bad debts where that change is made after the due date of the 1992 return, or that it can change its decision not to include in its consolidated return the activity of its subsidiary after the subsidiary went into conservatorship.  Does the Court have jurisdiction to consider an action for refund based on a post-1993 change in the estimated amount of the 1992 reserve for bad debts and on a change in the decision not to include the subsidiary's activities?

Plaintiff AmBase Corporation (hereafter "AmBase") commenced this civil action to seek the refund of an alleged tax overpayment in the amount of $7,162,875, plus applicable interest.  AmBase alleges that this overpayment stemmed from a net operating loss that arose in tax year 1992, which it seeks to carry back to tax year 1989.  *See* Compl. ¶ 22.[1]

---

[1]The claimed net operating loss allegedly arises from AmBase's present attempt to take a tax deduction for the 1992 tax year which would create a net operating loss to be carried back to the 1989 tax year.  The sought-after deduction is in an amount equal to the amount AmBase now claims its reserve for bad debts for the year 1992 should have been increased based upon estimates made after the 1992 return was filed of the amount that should have been included in the 1992 return.  The deduction then would create a loss to be carried back to 1989, generating a deduction from its taxable income for 1989.  Included in its claimed increase in the 1992 reserve for bad debts is an amount estimated to be necessary to cover receivables earned by one of its subsidiaries, Carteret Bank, for the period from December 4, 1992 to December 31, 1992, that will eventually go bad on the theory that it was a mistake for AmBase to elect not to include that corporation's income and deductions for the period after December 4, 1992, just because it had been taken over by a conservator on that date.

4669963.1

The United States moves to dismiss the action for lack of jurisdiction because the United States has not waived its sovereign immunity from suit in this case in which the plaintiff failed to meet the statutory requirement of filing a timely administrative claim before filing suit in the District Court.  The plaintiff did not file any administrative claim in 1995, as it alleges it did, and it can provide no evidence of any such filing.  Moreover, the 1995 filing it claims it made would, in any event, not meet the statutory definition of a requisite administrative claim.  Finally, the special seven-year period of limitation for filing a claim for refund on account of a specific debt that went bad during the relevant year upon which the plaintiff will likely attempt to rely in opposition is inapplicable here, where AmBase attempted to add a subsidiary's income and expenses for the period December 4, 1992 to December 31, 1992, and to rewrite history by changing, in 2000, its bad-debt reserve for 1992 in order to claim a larger tax deduction.  An increase in bad-debt reserve is not a charge off of a specific bad debt and thus the claimed increase in bad-debt reserve would not be eligible for seven year treatment.  The plaintiff's 1992 bad debt reserve must remain as it was determined to be when the plaintiff filed its original tax year 1992 return and the income and expenses of its subsidiary in receivership cannot be included in the 1992 return.  The plaintiff's failure to file a timely claim for refund is dispositive. For these reasons, its complaint must be dismissed.

BACKGROUND

Carteret was one of the largest saving and loan associations in New Jersey, and was the 19th largest savings and loan association in the country, as measured by deposits, in September 1987.  *See Carteret v. Office of Thrift Supervision*, 963 F.2d 567, 569 (3rd Cir. 1992); *AmBase*

*Corp. v. United States*, 58 Fed. Cl. 32, 37 n.4 (2003).  AmBase acquired Carteret in 1988.  On

December 4, 1992, the Office of Thrift Supervision ("OTS") seized Carteret and placed it into

conservatorship with the Resolution Trust Corporation ("RTC") for its failure to satisfy capital

requirements under the Financial Institutions Reform, Recovery, and Enforcement Act

("FIRREA").  *See Carteret*, 963 F.2d at 571; *AmBase*, 58 Fed. Cl. at 39; FIRREA, Pub. L. No.

103-73, 1989 U.S.C.C.A.N. (103 Stat.) 183 (codified in scattered sections of 12 U.S.C.).

AmBase did not include in its original corporate income tax return for tax year 1992 Carteret's

activity during the period after the seizure from December 4, 1992 to December 31, 1992.[2]

     Carteret's seizure was based on its failure to meet its risk-based capital requirement.

Important to its eventual seizure, Carteret acquired failing federally-insured thrifts in the 1980s,

including the First Federal Savings and Loan Association of Delray Beach, Florida ("Delray"),

and Barton Savings and Loan Association of Newark, New Jersey ("Barton").  *See Carteret*, 963

F.2d at 569.  The liabilities of both Delray and Barton exceeded their assets.  *See id.*  Despite that

fact, Carteret utilized the concept of supervisory goodwill, by which it treated the acquisition of

the liabilities of the failed thrifts as an amortizable asset in order to give the appearance on its

balance sheet that its assets exceeded its liabilities.  As this concept was described by the Third

Circuit, "[u]nder the purchase method of accounting, an acquiring institution [like Carteret]

could treat the excess of liabilities over the assets of the institutions it acquired as an intangible

---

[2]AmBase excluded the activity of Carteret during the period of its seizure from its 1992 return, filed in 1993.  Then, on April 28, 1997, AmBase stated in a letter to Carteret that it was not going to exclude the post-seizure income and expenses of Carteret in its 1992 income tax return.  AmBase, however, failed to actually include any activity of Carteret in its 1992 income tax return until March 2000, when it attempted (late and unsuccessfully, as the United States will show) to amend its 1992 return.

4669963.1

asset denominated 'supervisory goodwill,' and could amortize (i.e., convert from asset to expense) a portion of the supervisory goodwill at the end of each year for the purpose of calculating regulatory capital." *See Carteret*, 963 F.2d at 569.[3]  Counting the excess liabilities of the acquired thrifts as supervisory goodwill was essential to treating Carteret as solvent because the excess liabilities of Delray and Barton exceeded Carteret's pre-acquisition net worth.  *See Carteret*, 963 F.2d at 570.  Congress stepped in, however, to put an end to the use of so-called supervisory goodwill through its enaction of FIRREA in 1989.  FIRREA phased out the amount of supervisory goodwill that acquiring institutions like Carteret could use toward meeting capital requirements.  *See Carteret*, 963 F.2d at 571.  FIRREA also established the Office of Thrift Supervision (OTS), which examined Carteret in 1989 and 1990 and concluded that, when supervisory goodwill was not counted, Carteret failed to meet its risk-based capital requirement. *See Carteret*, 963 F.2d at 571.  The OTS then began to issue directives to AmBase to infuse Carteret with enough capital to meet its requirements.  One such order required AmBase to infuse $30 million of proceeds from the sale of another subsidiary, the Home Insurance Company.  *See AmBase*, 58 Fed. Cl. at 38.

At about the same time that AmBase struggled to keep Carteret afloat, the OTS discovered that the board of directors of AmBase had approved bonus payments and loan forgiveness to its corporate officers and directors from the proceeds of the Home Insurance Company sale.  *See AmBase* 58 Fed. Cl. at 38.  The OTS commenced enforcement proceedings

---

[3]At that time, the practice was allowed and was deemed to have no tax consequences.  As described by the Third Circuit, "[t]he existence of supervisory goodwill had no tax consequences because, as Carteret acknowledges, the Department of the Treasury does not permit any tax deduction for goodwill, which is assumed to have an unlimited useful life."  *Id.* at 570, *citing* 26 C.F.R. § 1.167(a)-3 (1991).

4669963.1

against several officers and directors of AmBase.  In February 1991, Carteret sought an

injunction against the OTS in the United States District Court for the District of New Jersey.  *See*

*Carteret Savings Bank, F.A. v Office of Thrift Supervision*, 762 F. Supp. 1159 (D.N.J. 1992).

The court granted the preliminary injunction in April 1991, but the Third Circuit reversed and

vacated the preliminary injunction in May 1992.  *See Carteret Savings Bank, F.A. v. Office of*

*Thrift Supervision*, 963 F.2d 567, 585 (3rd Cir. 1992).  Between the issuance of the preliminary

injunction by the district court and its vacation by the Third Circuit, OTS and AmBase reached a

settlement with respect to the officer and director bonuses.  AmBase agreed that, by August 9,

1991, it would acquire one of its former subsidiaries from Carteret that it had previously sold to

Carteret in 1988.  AmBase, however, failed to secure in time the financing required for the

acquisition.  *See AmBase*, 58 Fed. Cl. at 38.  And, a week after AmBase missed the deadline,

Carteret reported that "even if it were permitted to count all of the supervisory goodwill

contained in the preliminary injunction as regulatory capital, it would no longer be in capital

compliance under FIRREA."  *See Carteret*, 963 F.2d at 572.  Unable to obtain the requisite

capital internally, Carteret agreed to allow the OTS to market it for sale to secure new capital.

After failed attempts with two different investor groups to recapitalize Carteret, the OTS seized

Carteret and placed it into conservatorship with the Resolute Trust Corporation on December 4,

1992.

In September 1993 AmBase filed its consolidated income tax return for tax year 1992.  In

that return, AmBase reported the activities of Carteret for the period starting January 1, 1992,

through December 4, 1992; the date that the OTS seized Carteret.  The return did not include the

activity of Carteret during the period it was seized and included a statement, pursuant to 26

C.F.R. § 1.597-4(g), that elected to exclude the activities of Carteret Savings Bank, FA, for the period that it was seized by the OTS.

The tax issue in this case relates to AmBase's 1992 and 1989 tax returns.  In March 2000, AmBase attempted to file an amended income tax return for tax year 1992.  In that return, for the first time, AmBase included the activity of Carteret for the entire year starting January 1, 1992 through December 31, 1992, including activity with respect to bad debts reserves.[4]  This increased AmBase's reported net operating loss for 1992.  In the amended return filed in 2000 AmBase also purported to increase its own reserve for estimated bad debts for 1992 in order to increase its 1992 deduction for additions to its bad debt reserve.  Thus, in March 2000, AmBase attempted to redetermine its estimated bad debt reserve that it reported on its timely filed tax year 1992 return; the new determination was approximately $128 million, rather than the approximately $56 million it determined at the time it filed its 1992 return in September 1993.  This approximately $72 million increase in year 2000 to the amount of its previously-determined 1992 reserve was then claimed as an additional deduction in 1992, also causing an increase in net operating loss for 1992 that plaintiff now attempts to carry back to 1989 to obtain a refund of all taxes paid for 1989.

AmBase's actions represent its third attempt to eliminate its remaining 1989 tax liabilities and generate a refund.  AmBase has remaining tax liability for tax year 1989 because it has already lost two issues in litigation with the IRS – one in 1997 and another in 1999 – each of which, if successful, would have eliminated tax year 1989 liability and generated a refund.  The

---

[4] *See supra* note 2.  The attempt to include in its return Carteret's income and expenses for the period December 4, 1992 to December 31, 1992 would have been acceptable had AmBase done so by 1997, but it was too late to do so in the year 2000.

4669963.1

attempted redetermination in 2000 of its bad debt reserve for 1992 and attempt to include the Carteret activity, and the increased deductions taken as a result, constitutes AmBase's third separate attempt to eliminate the 1989 tax liability and generate a refund, which AmBase seeks here.

From an accounting point of view, reserves for bad debts permitted a corporation to freeze capital at year's end so that it would not be available to pay dividends *et cetera*, by permitting the corporation to estimate the amount of its receivables that would go bad in subsequent years. The reserve method was codified under § 166 of the Internal Revenue Code for all taxpayers until 1986. The Treasury regulations under § 166 set forth the rules for computing the bad debt deduction on the reserve method. Under the reserve method, a taxpayer is permitted to make a year-end estimate of bad debt reserve, reserve that amount of capital and then a deduction is permitted for tax purposes for reasonable additions to the bad debt reserve for the year.[5] The addition to the bad debt reserve is computed as follows:

> (Year-end estimated reserves) less (beginning of the year
> reserve) reduced by (specific charge offs during the year)[6]
>
> = addition to bad debt reserves

On the merits, AmBase would face a tremendous uphill battle to change its estimated bad debt reserve retroactively at this late date and then claim a related deduction, even if a claim for

---

[5]Reserve accounting for bad debts for tax purposes for ordinary taxpayers was eliminated in the Tax Reform Act of 1986. *See* Pub. L. 99-514, 100 Stat. 2085, 2361.

[6]On the reserve method, when debts actually go bad there is no direct tax effect, since the debt is charged off by reducing the reserve. There can be an indirect effect on taxes, however, because, assuming the year-end estimated reserve is not changed on account of the charge off, the addition to the reserve for bad debts will be increased for the year to account for the fact that the reserve at the beginning of the year was reduced on account of the charge off.

refund had raised that theory.  It would face a tremendous uphill battle because caselaw holds that the income tax treatment of bad debt reserves stems from the purpose of a bad-debt reserve, which was to freeze capital so that it cannot be paid out as dividends, *et cetera*.  Thus, the estimate made at the time the return is filed is the relevant fact upon which the deduction depends, and that fact does not change, even if the taxpayer later has second thoughts as to whether the estimate made at the time the return was filed was the best estimate.  The estimate that was made is the estimate that was made.  The Internal Revenue Code merely provides a deduction for the amount necessary to reach the amount of the reserve actually estimated for the year at the time the return is filed.  Because the intended reserve for the year at the time the return is filed is a fact that cannot change after the return is filed, once the determination of how much should be reserved is made, the amount of the reserve for that year cannot be changed.[7]  If it is later determined that the determined reserve was too low, that mistake in estimating the proper reserve can only be corrected in the subsequent year when the new determination is made and additional capital is frozen.  *See, e.g., Wengel v. United States*, 306 F. Supp. 121, 123 (E.D. Mich, 1969), *citing* 26 C.F.R. § 1.166-4(b)(2), *and Rio Grande Building & Loan Assoc. v. Internal Revenue Service*, 36 T.C. 657, 664 (1961).[8]  Under the case law, because the determined

---

[7]Where a taxpayer makes an estimate of the amount to be included in the reserve for bad debts, but a figure different from the estimated amount is utilized in filing the return, an amended return can be filed to correct the error in not originally properly include the amount actually estimated.  *See* Rev. Rul. 75-560.

[8]In *Rio Grande*, the Tax Court held that

> there can be no doubt that a taxpayer is not to be permitted to enlarge its reserve account retroactively, based upon subsequent events which later support the view that the reserve is inadequate.  In such a situation, the added amount would not be a reasonable addition as of

4669963.1

capital reserve for 1992 could not be changed after the 1992 return was filed in 1993, there could

be no post-1993 addition to the reserve to be deducted for 1992. *See id*. AmBase apparently

seeks to challenge that caselaw here.

Regardless, because of its failure to timely file a claim for refund raising the grounds it

seeks to assert here, AmBase cannot invoke the jurisdiction of this Court to claim the refund it

seeks to generate. After a discussion of the applicable standard for motions to dismiss for lack of

jurisdiction, including facial and factual attacks, the United States will demonstrate that AmBase

failed to file a claim for refund within any applicable period of limitations.

## THE STANDARD AND BURDEN

As the plaintiff and party attempting to invoke the jurisdiction of the Court in this action,

AmBase bears the burden to establish that jurisdiction. *See Sharkey v. Quarantillo*, 541 F.3d 75,

82-83 (2d Cir. 2008) ("The party invoking federal jurisdiction bears the burden of establishing"

that jurisdiction exists), *quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). As

part of that burden, "[e]ach factual issue necessary to support subject matter jurisdiction 'must be

supported in the same way as any other matter on which the plaintiff bears the burden of proof,

i.e., with the manner and degree of evidence required at the successive stages of litigation.'" *See

id.*, *quoting Lujan*, 504 U.S. at 561.

AmBase cannot meet its burden, and cannot withstand either a facial or factual attack of

its attempted invocation of this Court's jurisdiction. In a jurisdictional facial attack, the

_____

the end of the year involved and therefore is not allowable.

*See Rio Grande*, 36 T.C. at 664 (1961).

4669963.1

defendant challenges the sufficiency of the pleadings and a court "takes all the allegations in the complaint as true and draws all inferences in favor of the non-movant."  *See Russo v. Hartford*, 184 F. Supp. 2d 169, 178 (D. Conn. 2002)*; Tuchman v. Connecticut*, 185 F. Supp. 2d 169, 171 (D. Conn. 2002).  In a factual attack, "no presumptive truthfulness [attaches] to the facts alleged in the complaint, and the court may consider evidentiary matters presented in an affidavit or otherwise in addition to the complaint."  *See Russo*, 184 F. Supp. 2d at 178.  In this motion to dismiss, the United States attacks AmBase's complaint both facially and factually; AmBase's complaint fails under both.

## ARGUMENT

I.      *Requirements to Prosecute Civil Actions for Refund*

A civil action against the United States is precluded unless Congress specifically and statutorily waives the sovereign immunity of the United States.  *See Orff v. United States*, 545 U.S. 596, 601-602 (2005)*; United States Department of Energy v. Ohio*, 503 U.S. 607, 615 (1992); *United States v. Dalm*, 494 U.S. 596, 608 (1990).  And, when Congress explicitly waives the sovereign immunity of the United States, such waiver "must be strictly construed in favor of the sovereign," and not "enlarge[d] . . . beyond what the language requires."  *See United States v. Nordic Village*, 503 U.S. 30, 34 (1992) (internal citations omitted).

In the context of this type of civil action – where a plaintiff seeks a refund of a purported tax overpayment – Congress provides a limited waiver of the United States' sovereign immunity.  That limited waiver is found in 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422 and the regulations promulgated thereunder.  In order to secure this limited waiver of sovereign immunity, a taxpayer

11

must strictly comply with the requirements of the statutes and regulations.  Those requirements include the timely filing of a pre-litigation administrative claim.  Specifically, before filing a civil action for refund against the United States, a taxpayer must file a claim for refund with the Internal Revenue Service.  *See* 26 U.S.C. § 7422(a).  Generally, the taxpayer must file the claim prior to the expiration of 3 years from the time it filed the return, or 2 years from the time it paid the tax, whichever occurs last.  *See* 26 U.S.C. § 6511(a).

AmBase failed to meet this requirement and therefore cannot maintain this suit.  AmBase alleges in its complaint that it made a timely informal claim in June 1995 that indefinitely tolled the applicable period of limitations for filing a refund claim.  *See* Compl. ¶¶ 24-25.  AmBase cannot show that it filed a claim for refund, formal or informal, in June 1995.  Thus, with respect to a refund claim under § 6511(c), this Court lacks subject matter jurisdiction.

Since AmBase failed to timely file a refund claim under § 6511(c), it likely will continue to argue, incorrectly, that it timely filed a refund claim in March 2000, within the special seven-year period of limitations with respect to bad debts under § 6511(d)(1).  But, as a matter of law, this special seven-year period of limitations does not apply to AmBase's claim for refund.  We address first the inapplicability of the special seven-year period of limitations with respect to bad debts and then address the inability of AmBase to establish jurisdiction under § 6511(c).

II.  *The Special Period of Limitations for Filing a Claim for Refund with Respect to Bad Debts Does Not Apply Where, as Here, the Taxpayer Does Not Claim a Refund Resulting From Specific Debts That Went Bad in a Prior Year.*

Section 6511(d)(1) of the Internal Revenue Code provides a special period of limitations with respect to bad debts and worthless securities.  Under that section:

> . . . [i]f the claim for credit or refund relates to an overpayment on account of the effect that the deductibility of such a debt or loss has on the application to the taxpayer of a carryback, the period shall either be 7 years from the date prescribed by law for filing the return for the year of the net operating loss which results in such carryback or the period prescribed in paragraph (2) of this subsection, whichever expires the later.[9]

*See* 26 U.S.C. § 6511(d)(1).  Even taking all the allegations raised in AmBase's complaint as true under a subject matter jurisdiction facial attack, AmBase cannot invoke the seven-year limitations period prescribed by § 6511(d)(1) for bad debts because it does not claim a deduction on account of specific debts that went bad.  Instead, it claims a deduction related to a retroactive change in its previously-made estimated reserves for bad debts.  Section 6511(d)(1) has no application to claims for a deduction due to a retroactive change in the reserves.

Generally, § 166 of the Internal Revenue Code allows taxpayers to take deductions for bad debts, defined as debts that become worthless within the taxable year.  Taxpayers applying this section generally use what is called the direct charge-off method.  Historically, the Internal Revenue Code also permitted a taxpayer which reserved its capital so that it could not be used for other purposes, by setting up a reserve for bad debts, to take a deduction for the additional amount of capital that it determined should be reserved for the year.  If the taxpayer did not make the decision to reserve the capital by the time the return was filed, no deduction was permitted until the tax year in which the capital was actually reserved.  This was called the reserve method.  While, since the Tax Reform Act of 1986, most taxpayers can no longer use the reserve method, §§ 585 and 593 of the Internal Revenue Code still permit "banks" as defined by § 581, such as

---

[9]Paragraph 2 relates to net operating loss carrybacks and provides for a 3-year period of limitations, which would not help AmBase here.  Instead, AmBase will likely argue, albeit incorrectly, that the 7-year period applies.

4669963.1

AmBase, to use it.

Taxpayers who utilize the direct charge-off method deduct each bad debt directly from income in the year it becomes worthless.  A taxpayer who may utilize the reserve method – such as AmBase – deducts an amount equal to the addition to bad debt reserves necessary to reach the amount it determines should be included in its reserves at the time it files its original return.  That reserve normally equals the amount of debts held by the taxpayer that are expected, as of the date of the filing its return, to become worthless in the future.  *See* 26 U.S.C. §§ 585, 593.  As explained by the Supreme Court:

> [u]nder the reserve method of accounting a taxpayer includes in his income the full face amount of a receivable on its creation and adjusts at the end of each taxable year the reserve account so that it equals that portion of current accounts receivable that is estimated to become worthless in subsequent years.  When an account receivable becomes worthless during the year, the reserve account is decreased and no additional bad debt deduction is allowed.

*See Nash v. United States*, 398 U.S. 1, 2 (1970).  A taxpayer who uses the reserve method still charges off worthless debts in the year they become worthless, but the debts are charged off against the reserve account, rather than being deducted directly from income.  While the worthless debt is not directly charged to income, it can have an effect on income if it does not reduce the ultimate reserve for bad debts because an amount equal to the charged off debt must be added to additions to bad debts to bring the reserve back up to the appropriate level.  *See Smith Electric Company, Inc. v. United States*, 198 Ct. Cl. 644, 646 (1972).

Thus, AmBase's reserve for bad debts was an estimate – as of the date of filing its 1992 return – of debts that would become worthless in the future.  Related deductions, in turn, were not for debts that had gone bad; they were for the addition to the reserve to bring it up to the level

14

determined at the time the return was filed to be necessary to satisfy estimated debts that would

go bad in the future.  To make its estimates for additions to the bad-debt reserve, AmBase

employed the experience method of determining reasonable additions to its reserve.  *See* 26

U.S.C. § 585(b)(2).  Under the experience method prescribed by the Internal Revenue Code, the

addition to the reserve for bad debt

> shall be the amount necessary to increase the balance of the reserve
> for losses on loans (at the close of the taxable year) to the greater of–
>
> > (A) the amount which bears the same ratio to loans
> > outstanding at the close of the taxable year as (i) the total bad
> > debts sustained during the taxable year and the 5 preceding
> > taxable years . . . adjusted for recoveries of bad debts during
> > such periods, bears to (ii) the sum of loans outstanding at the
> > close of such 6 or fewer taxable years, or
> >
> > (B) the lower of–
> > > (i) the balance of the reserve at the close of the base
> > > year, or
> > >
> > > (ii) if the amount of loans outstanding at the close of
> > > the taxable year is less than the amount of loans
> > > outstanding at the close of the base year, the amount
> > > which bears the same ratio to loans outstanding at the
> > > close of the taxable year as the balance of the reserve
> > > at the close of the base year bears to the amount of
> > > loans outstanding at the close of the base year.

*See* 26 U.S.C. §§ 585(b), 593(b)(3); 26 CFR § 1.593-5.  AmBase used a formula that included

the outstanding debts and the corresponding chargeoffs to determine a bad debt experience

factor.  It then applied that factor to its then-current outstanding debt to arrive at the maximum

possible reserve for bad debts.  It then applied judgment to determine what the actual reserve

should be.  In its original corporate income tax return for tax year 1992, filed in September 1993,

AmBase determined that the maximum amount that it could carry as its bad debt reserve under

the formula.  *See* Ex. 1.  In that same return, filed after the close of taxable year 1992, however,

AmBase determined that the appropriate reserve was far less than the maximum based on the

formula.  The amount of capital that was frozen for that year was then the $56,005,961 estimated

to be necessary for the bad debt reserve.  *See* Ex. 1.  Presumably, AmBase chose to reserve less

than the maximum that it calculated it could add under the formula because, at the time it filed

the original 1992 return in September 1993, it did not believe that the maximum amount was

necessary and it did not choose to freeze the additional capital.[10]

AmBase's attempted use of § 6511(d)(1), if it continues to invoke that statute, is out of

line with every judicial interpretation of the law.  The seven-year statute can only apply to a

claim for overpayment attributable to a claim that a specific debt went bad in a given year, but

was not previously accounted for.  Section 6511(d)(1) allows a taxpayer to file a refund claim

within seven years from the date the return was due for the taxable year for which it is claimed

---

[10]Recognizing that the only purpose of the type of a retroactive change AmBase seeks to make would be to obtain a tax benefit, the Fifth Circuit, citing *Rio Grande*, ruled that since the "[t]axpayer did not manifest an intent to take the maximum allowable deduction in the first place . . . we see little reason for allowing [the] taxpayer to take that deduction now solely for the purpose of obtaining a larger tax deduction."  *See Am. Nat'l Bank v. United States*, 497 F.2d 40, 43 (5th Cir. 1974).  The reserve method allows a taxpayer to take a present deduction of amounts added to its bad debt reserve that estimates debts that will become worthless in the future.  By statute, this amount is determined at the close of the taxable year.  *See* 26 U.S.C. §§ 585(b)(2); 593(b).  As stated in *Rio Grande*,

> [t]he Code does not state that a reasonable amount may be deducted, but states that an amount *determined* by the taxpayer as the reasonable amount may be deducted.  It follows, therefore, that this amount cannot be *greater* than the amount determined to be a reasonable reserve addition at the end of each year, albeit a larger amount would have been reasonable and allowable if it had been so determined.

*See Rio Grande*, 36 T.C. at 665.

that the debt went bad because a specific debt can only be claimed as bad in the year it actually went bad and sometimes that year cannot be determined within three years of filing a return.  In order to prevent a whipsaw that could occur because of a taxpayer's need to establish when a debt went bad, Congress passed the special seven-year provision.  Estimated increases in reserves for bad debts, even if they could be claimed retroactively, which they cannot, *see Wengel* and *Rio Grande*, do not involve specific debts that have actually gone bad and therefore do not fit within § 6511(d)(1).  Courts do not interpret the law to allow a taxpayer to use the special period of limitations to file claims for refund with respect to specific bad debts to also permit taxpayers to wait seven years to retroactively revise its previously-made estimated reserve for bad debts in order to generate a larger deduction.[11]

As courts uniformly recognize, a taxpayer's attempt, like AmBase's here, to change its

---

[11]In addition to the caselaw, the applicable regulations to § 166 of the Internal Revenue Code relating to bad debts explicitly preclude this retroactive adjustment of additions to the bad debt reserve.  "What constitutes a reasonable addition to a reserve for bad debts shall be determined in the light of the facts existing *at the close of the taxable year of the proposed addition*."  *See* 26 C.F.R. § 1.166-4(b)(1) (emphasis added).  And, "[i]n the event that subsequent realizations upon outstanding debts prove to be more or less than estimated at the time of the creation of the existing reserve, the amount of the excess or inadequacy in the existing reserve shall be reflected in the determination of the reasonable addition necessary in the current taxable year."  *See* 26 C.F.R. § 1.166-4(b)(2).  In other words,

> [t]he remedy of a taxpayer who incorrectly estimates the needed addition to the reserve for bad debts is not a claim for refund, but a correction of the amount in the bad debt reserve through the determination of the reasonable addition to the reserve for the current year.

While § 166(c) was repealed by the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2361, and no longer generally permits the use of the bad debt reserve method, the regulations under § 166 are applicable to bad debt reserve accounting under § 585.  *See* 26 C.F.R. § 1.585-1(a).

4669963.1

reserve calculation retroactively for tax purposes is a perverse use of the law and out of line with Congressional intent.  Congress prescribed the special seven-year period of limitations with respect to specific bad debts and worthless securities to prevent taxpayers from experiencing a whipsaw with respect to bad debt chargeoffs taken in the wrong year.  For example, if a taxpayer charged off a bad debt in year 2, but in year 5 the IRS successfully challenged that the bad debt actually became worthless in year 1, the regular limitations period for filing a refund claim for year 1 would have expired.  *See* 26 U.S.C. § 6511(a).  The consideration of Congress in enacting the special seven-year period was to allow taxpayers additional time to claim a refund if they discovered, through later-found evidence, that a debt had become worthless in a different tax year.  *See* H.R. Rep. No. 2333, 77th Cong., 1st Sess, reported in 1942-2 C.B. 372, 408 (explaining former Internal Revenue Code section 322(b)(5), the forerunner to section 6511(d)(1)); *see also Indiana National Corp. v. United States*, 980 F.2d 1098, 1102 (7th Cir. 1992).

Despite the uniformity of the caselaw disallowing for tax purposes the type of retroactive accounting entry claimed by AmBase, it likely will argue here, as it has in the past, that it learned some new evidence in the intervening years that caused the retroactive determination.  In its complaint, AmBase alleges that "[a]fter 1995, Plaintiff received information regarding Carteret and New Carteret that enabled it to increase the bad debt deduction for taxable year 1992 to which it is entitled.  Plaintiff is entitled to a bad debt deduction in the amount of at least $125,253,834 for taxable year 1992 . . ."  *See* Compl. ¶ 21.  Regardless of the truth or falsity of that allegation, AmBase still falls outside of the application of the special provision of § 6511(d)(1) because, even if it could retroactively determine its reserve addition (which it cannot),

4669963.1

AmBase did not claim that a particular debt went bad in a different tax year.  A claim based on an allegation that a debt went bad in a year other than the year in which the debt was charged off is necessary to invoke § 6511(d)(1) and the jurisdiction of the Court under the seven year statute and the Court's jurisdiction would be limited to any claim based upon that allegation.  AmBase makes no such allegation here.

AmBase cannot rely upon the special seven-year period of limitation to file a claim for refund under § 6511(d)(1) because AmBase's claim – that it can retroactively adjust the amounts it previously determined to be an appropriate reserve for bad debts at the close of the taxable year 1992 and that it can elect to include in its return Carteret's December 4, 1992 to December 31, 1992 income and expenses, including increases in reserve for bad debts – does not rely upon subsequently discovered evidence that a specific debt went bad in 1992.[12]  Thus the claim for refund filed in 2000 is not timely and cannot support jurisdiction in this case.

III.    *AmBase Failed to File a Timely Claim with Respect to the Normal Period of Limitations*

A.    AmBase failed to timely file a refund claim

The longest normal statute of limitations for filing a claim for refund as set forth in § 6511(a) of the Internal Revenue Code is three years from the date the return was filed.  Under

---

[12]It is also not clear that AmBase (or Carteret) actually made any extra addition to its reserve for bad debts in 1992, 1995, or 2000.  AmBase and Carteret must do more than just file a Form 1120X that claims a deduction for additional additions made to its reserve; they must have actually made the new additions to the reserve, thereby freezing in-use capital.  *See, e.g.*, Ex. 3; *Rio Grande*, 36 T.C. at 666.

4669963.1

§ 6511(c), that period can be extended.[13]  AmBase failed to timely file a claim for refund within

the period of limitations as extended by § 6511(c).  Moreover, under a factual attack, AmBase

cannot establish that it filed any document in 1995, or any time prior to 2000, or that it filed or

even claims to have filed any document that would qualify as a claim for refund for the relevant

tax years, whether that claim is alleged to be informal or formal, within the limitations period in

§ 6511(c).

Under § 6511(c), AmBase had until March 31, 1998, to file a claim for refund for income

tax year 1989.  It is incumbent upon AmBase to provide the statutorily required proof of the

alleged 1995 filing.  AmBase cannot meet that requirement and IRS records show that the alleged

1995 filing never happened.

Generally, a taxpayer may make a claim for refund through an amended return, as

AmBase alleges it did in June 1995.  *See* 26 C.F.R. § 301.7502-1(b)(2).  And, "[i]n general, an

income tax return is deemed filed on the date when the return is physically delivered to and

received by the IRS."  *See Washton v. United States*, 1993 U.S. Dist. LEXIS 2863, *8 (D. Conn

February 12, 1993), *citing Miller v. United States*, 784 F.2d 728, 730 (6th Cir. 1986).  There are,

---

[13]Generally, the period of limitations for filing a claim for refund is "3 years from the time
the return was filed or 2 years from the time the tax was paid."  *See* 26 U.S.C. § 6511(a).  The
Internal Revenue Code also provides a special period of limitations with respect to net operating
loss, which would apply here since AmBase attempts to carry back net operating loss from tax
year 1992 to tax year 1989.  Under § 6511(d)(2), in lieu of the general 3-year rule described
above, "the period shall be that period which ends 3 years after the time prescribed by law for
filing the return (including extensions thereof) for the taxable year of the net operating loss or net
capital loss which results in such carryback."  *See* 26 U.S.C. § 6511(d)(2).  Whether the general
period of limitations or the special period of limitations for net operating loss applies, however,
is academic because under each period of limitations is an exception in cases of extension of the
period of assessments by agreement between taxpayers and the IRS.  *See* 26 U.S.C. § 6511(c).
Such an agreement was reached between AmBase and the IRS to extend the period of assessment
for tax year 1989 to September 1997.

4669963.1

however, two statutory exceptions to the rule that, to be considered filed, a document must be received by the IRS.  These exceptions permit a return that is timely mailed to be considered received when it is mailed.  First, if the tax return or refund claim is eventually received by the IRS, and the postmark shows that it was timely mailed, "the date of the United States postmark stamped on the cover in which such return, claim, statement, or other document, or payment, is mailed shall be deemed to be the date of delivery or the date of payment, as the case may be." *See* 26 U.S.C. § 7502(a).  Second, if the claim was sent by registered mail, "such registration shall be prime facie evidence that the return, claim, statement, or other document was delivered to the agency . . ."  *See* 26 U.S.C. § 7502(c)(1)(A).  Neither statutory exception to the general rule–that to be filed a return must be actually received by the IRS– applies here.  The first exception is precluded because AmBase cannot provide any proof that the IRS actually received any sort of claim in June 1995.  To the contrary, the Certificates of Assessments and Payments, attached and incorporated herein, do not reflect that the IRS ever received a claim for refund in June 1995.  *See* Ex. 4.  The second exception also is precluded because AmBase did not send, or allege to have sent, the purported claim by registered mail.

In the Second Circuit, "the failure of the taxpayer to send a federal income tax return by registered mail precludes the taxpayer from relying on circumstantial evidence to prove the return was timely filed."  *See Washton*, 1993 U.S. Dist. LEXIS 2863, *10, *citing Deutsch v. Commissioner*, 599 F.2d 44, 46 (2d. Cir. 1979).  "'Where, as here, the exception of section 7502 is not literally applicable, courts have consistently rejected testimony or other evidence as proof of the actual date of mailing.'" *See id.*  In discovery, AmBase produced a copy of a 1992 Form 1120X which it claims it may have provided to an unnamed IRS employee in June 1995 under

"routine business practices."  *See* Exs. 3, 5.  Again, the Second Circuit does not consider such circumstantial evidence to prove that the claim was filed.  Moreover, the copy of the purported Form 1120X does not contain a stamp or any other indication that the IRS acknowledged its receipt.  If AmBase did submit the Form 1120X, which the United States contends it did not, it was incumbent upon AmBase to retain an IRS-stamped copy to prove receipt.  *See Halle v. Commissioner of Internal Revenue*, 175 F.2d 500, 502 (2nd Cir. 1949) ("Implicit in the working of the [tax] system is an obvious duty of keeping proper records imposed on the taxpayer.").

In the end, AmBase's allegation that it filed the Form 1120X produced in discovery, albeit without any of the requisite proof, is academic.  Even if AmBase had timely filed the Form 1120X it produced in discovery, that Form 1120X does not begin to rise to the level of a proper claim for refund, informal or otherwise, that would support the Court's jurisdiction over the issues raised in this case.

> B.      Assuming, for purposes of argument, that AmBase's purported Form 1120X was actually filed, it is not a proper claim for refund

In response to the United States' discovery requests, AmBase produced a copy of a Form 1120X for income tax year 1989 that it alleges it filed with the IRS in 1995 as a so-called protective claim.  *See* Ex. 5 (Req. Prod. 1, 2).  AmBase's theory appears to be that it can make a "protective claim" which does not meet the requirement to put the IRS on notice of a specific claim, and thereby indefinitely hold open the period of limitations for filing a proper claim for refund.

Even if AmBase had timely filed this Form 1120X with the IRS, which the United States

contends above it did not, the Form 1120X is not a valid protective claim for refund supporting jurisdiction over the claims it seeks to raise in this action for two reasons.  First, the Form 1120X violates the variance doctrine since its claims (as an amended return) vary from the refund claims that AmBase makes in this civil action.  Second, the purported Form 1120X was never "perfected" as AmBase alleges; if anything, the alleged protective claim was closed in 1999 when the events discussed in the Form 1120X had come to their respective conclusions.[14]

Under the Internal Revenue Code,

> [n]o suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

*See* 26 U.S.C. § 7422(a).  The regulations promulgated by the Secretary of the Treasury under the specific delegation of the statute prescribe that:

> No refund or credit will be allowed after the expiration of the statutory period of limitation applicable to the filing of a claim therefor except upon one or more of the grounds set forth in a claim filed before the expiration of such period.  The claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof.  The statement of the grounds and facts must be verified by a written declaration that is made under the penalties of perjury.  A claim which does not comply with this paragraph will not be considered for any purpose as a claim for refund or credit.

*See* 26 C.F.R. § 301.6402-2(b)(1).

---

[14]The IRS did not send a notice of disallowance of the refund claim because, as described above, the IRS never received the Form 1120X in June 1995.

4669963.1

At the heart of the variance doctrine is the requirement that the receiving administrative agency be given sufficient detail about a particular claim to be able to determine whether it should be granted administratively.  The purported claim here does not come close to meeting that requirement.  The variance doctrine requires that a claim for refund be sufficiently similar to the action before a district court and "is intended 'to promote thorough administrative investigation of claims by ensuring that the IRS gets a sufficiently detailed claim.'" *See Pepe v. United States*, 1994 WL 583121, *2 (D. Conn. 1994), *quoting In re Tax Refund Litig.*, 766 F. Supp. 1248, 1253 (E.D.N.Y. 1001), *aff'd in part*, 989 F.2d 1290 (2d Cir. 1993), *cert. denied*, 510 U.S. 964 (1993).  Thus, "[a] claimant may not raise a wholly new factual basis for his claim at the later trial . . . but also he may not shift the legal theory of his claim."  *See Scovill Mfg. Co. v. Fitzpatrick*, 215 F.2d 567, 569 (2d. Cir. 1954).  The claims AmBase purports to have made in its "protective claim" of June 1995 vary from its assertion of entitlement to a refund in this civil action on both a legal and factual basis.  In this action, AmBase seeks a refund based on its revision of its previously determined estimate of its reserve for bad debts in order to generate a larger deduction in the tax year 1992, and it seeks to revoke the decision it made when it filed its original 1992 return, in 1993, to not include Carteret's post-seizure activity in its 1992 return.

In its purported "protective claim," on the other hand, AmBase stated that "[t]his claim has been filed to preserve the taxpayer's right to a refund if, as a result of the above-described proceeding in the Tax Court, the examination of the taxable year 1992, or any other determination made with respect to an open taxable year of the taxpayer, it is determined that there exist any or all of the following: . . . . Carryback of any tax credits . . . [or] net operating losses . . . from tax years ending after December 31, 1989 into tax year 1989." *See* Ex. 6.  The

4669963.1

so-called protective claim goes on to explain that "[u]ntil the Tax Court proceeding and the Service's examination of the taxable year 1992 have been concluded, it is impracticable for the taxpayer to attempt to compute a revised tax liability for 1989." *See* Ex. 6.  As such, the "protective claim" related to a Tax Court proceeding and an examination of the 1992 tax year. Neither the Tax Court proceeding nor the IRS examination related to AmBase's belated redetermination of its bad debt reserve or attempt to revoke its previous decision to exclude Carteret's post-seizure activity.  The "protective claim" is not sufficiently similar, or even related to, AmBase's assertion of entitlement to a refund in this civil action based on its redetermination or revocation of its decision.

The purported "protective claim" in 1995 related to two specific issues in the Tax Court. The "fresh start" issue raised in the Form 1120X refers to AmBase's 1996 proceeding in the United States Tax Court which sought to exclude from taxable income the difference between undiscounted and discounted year-end 1986 loss reserves.  *See Atlantic Mutual v. Commissioner of Internal Revenue*, 523 U.S. 382 (1998).  In November 1999, after the United States Supreme Court ruled in the United States' favor with respect to its interpretation of reserve strengthening for the fresh start, AmBase and the IRS entered a stipulation of settlement that increased AmBase's income for tax year 1987 by $29,000,000.  *See AmBase Corp. and Subsidiaries v. Commissioner of Internal Revenue*, Tax Court Docket No. 11590-96, Doc. Ent. 52, 56.  This *increase* of AmBase's income for tax year 1987 lacks any similarity or relation to its attempt now to revoke its decision with respect to Carteret's post-seizure activity or to redetermine additions to its reserve for bad debts to generate a net operating loss carryback to tax year 1989.

A November 2001 memorandum written by Grant Thornton, AmBase's tax preparer,

4669963.1

further highlights this disconnect.  As stated in the memorandum:

> Prior to the settlement of the Fresh Start issue, losses had been carried back from 1990 to 1987 and the excess to 1988 and 1989.  The 1991 losses were carried back to 1989.  These losses resulted in no taxable income for 1987-1989.  Upon settlement of the Fresh Start issue[,] the excess losses from 1987 to 1988 were reduced along with the losses for 1989.  1992 losses now need to be carried back to 1989, as a result of the Fresh Start settlement.  However, there were insufficient losses in the originally filed 1992 return to eliminate 1989 taxable income.  Amending the 1992 return to include Carteret Federal's activity for 12/5/1992 through 12/31/92 results in a sufficient amount of losses to eliminate 1989 taxable income.

*See* Ex. 2.  The memorandum spells out that the fresh start claim purportedly made by AmBase in June 1995 is substantially *dis*similar from its decision to exclude Carteret's post-seizure activity and its reserve redetermination claim in this action.  Moreover, it shows that once AmBase lost the fresh start issue, it looked for a new and different way to eliminate income for tax year 1989 that was not apparent, nor of course claimed, in 1995.  *See Goelet v. United States*, 266 F.2d 881, 882 (2d Cir. 1959) (refusing to consider new ground for taxpayer's claim when the taxpayers sought a deprecation deduction before the IRS and a deduction for the "premium value" of their lease before the court).  And, the agreed decision entered in the Tax Court in November 1999 ended the possibility that AmBase could later "perfect" its June 1995 claim, since the increased income for tax year 1989 could not result in any kind of refund of an overpayment, and since it had nothing to do with income tax year 1992.

The other ground AmBase raised in its purported June 1995 protective claim related to the IRS examination of AmBase's 1992 return for AmBase's capital loss deduction in the amount of $99,993,000.  AmBase claimed that the stock of Carteret Bankcorp, Inc., was worthless after the Bank's seizure.  In May 1997, the IRS disallowed the capital loss deduction.

26

Shortly thereafter, on June 5, 1997, AmBase agreed to the disallowance by signing a Form 870,

Waiver of Restrictions on Assessment and Collection.  *See* Ex. 7.  Like the fresh start claim, the

disallowance of the capital loss deduction is a species apart from AmBase's attempt in this civil

action to carry back a net operating loss that arose in 1992 due to a redetermined addition to its

reserve for bad debts and revocation of an election not to include Carteret Bankcorp's post

December 4, 1992 activity on its return.  And, the agreed disallowance of the deduction signed by

AmBase in June 1997 ended the possibility that AmBase could later "perfect" its purported June

1995 protective claim, since the elimination of that deduction could not result in any kind of

carryback.

In its alleged claim of June 1995, AmBase also attempted to make a claim to "preserve

[its] right to a refund" with respect to "any other determination made with respect to an open

taxable year of the taxpayer."  *See* Ex. 6.  This final catch-all language is of the kind that is "so

deficient that it failed to apprise the Service of any clear basis for a refund."  *See Decker v.

United States*, 1993 U.S. Dist. LEXIS 10645, *11 n.7 (D. Conn. 1993).  Even an informal claim

"must at least alert the IRS that the taxpayer seeks a refund and must also indicate the grounds

upon which the taxpayer's claim is based."  *See United States v. Forma*, 42 F.3d 759, 767 n.13

(2d Cir. 1994), *citing United States v. Felt & Tarrant Mfg. Co.*, 283 U.S. 269, 272 (1931).  The

language "any other determination made with respect to an open taxable year of the taxpayer"

falls well short of this mark.  It fails to apprise the IRS of the facts and legal theories necessary to

prevent surprise or open an examination into the claim.  *See Magone v. United States*, 733 F.

Supp. 613, 618 (S.D.N.Y. 1989) ("the claim – even if informal – still must sufficiently apprise

the IRS of enough facts and legal theories to prevent surprise in the later civil suit . . . '[i]t is not

4669963.1

enough that the Service have in its possession information from which it might deduce that the

taxpayer is entitled to, or might desire, a refund.'"), *quoting American Radiator & Standard*

*Sanitary Corp. v. United States*, 318 F.2d 915, 920 (Ct. Cl. 1963).  If AmBase's language were

deemed a sufficient claim for refund, it would open the door for all taxpayers and tax return

preparers to file such a claim with every tax return to ensure the taxpayer's ability to assert the

possibility of a refund under any possible legal theory that might arise at any point in the future.

Since it would have no facts and no grounds on which the IRS could act administratively, the

courts would be flooded with lawsuits over matters that are now disposed of administratively.

Essentially, a taxpayer would be able to write out of the law the proper function of an

administrative claim simply by filing a "protective" claim on such unspecific grounds.

Perhaps most telling, however, is that the Form 1120X that AmBase filed in March 2000

– and which AmBase asserts perfected the purported June 1995 protective claim – does not even

mention a June 1995 protective claim.

More generally, AmBase's alleged use of a "protective claim" in this action is not

supported by the Internal Revenue Code or the regulations promulgated with respect to refund

claims, nor is it sanctioned by the Second Circuit.  The generality of the purported protective

claim alleged here by AmBase stands in stark contrast to the kind of specific informal claim that

asserted a present right to refund based upon future contingent events that the Supreme Court

allowed in *United States v. Kales*.  *See United States v. Kales*, 314 U.S. 186, 195 (1941).  In

*Kales*, the Supreme Court allowed a taxpayer's letter to the IRS that claimed a "right to refund of

taxes paid in 1920 in the event that the 1919 appraisement of the stock should be set aside by the

Bureau or be determined to be erroneous" to serve as an informal claim that was perfected by a

later claim.  *See id.*  The Court reasoned that the IRS "could have been left in no doubt that she

was setting forth her right to a refund in the event of a departmental revision of its 1919 valuation

of her stock."  *See id.*  The generality of AmBase's purported protective claim gives no indication

of a present assertion of a specific right to a refund based upon the happening of a named future

event.  Instead, it attempts to keep the applicable statute of limitations open for any and all

contingencies, whether or not they were even presently known in 1995.  AmBase's alleged

protective claim pushes far beyond the limits and circumstances established by the Supreme

Court in *Kales*.[15]


C.      There is no other informal claim here

In its complaint and discovery responses, AmBase also alleges to have made an informal

claim for refund apart from its alleged protective claim of June 1995.  Specifically, AmBase

alleges that certain IRS history notes and meetings somehow added up to an informal claim by

---

[15]AmBase also seems to be preparing to raise yet another possibility– that it (or, actually, Carteret) filed a claim in 1996 that meets the applicable tests.  While AmBase made no mention of it in the Complaint, AmBase has raised during discovery the argument that Carteret actually filed a 1996 claim.  This argument, if pursued, is a non-starter, and we will address it more completely if raised formally by the plaintiff.  But, for now, we point out that the purported 1996 "claim" does not help the plaintiff because there is no evidence that a valid claim was filed by Carteret in 1996.  The only evidence the plaintiff seems to have of  this "claim" are two letters from the IRS describing non-processable "protective claim[s]" and inviting the plaintiff to file proper claims.  Moreover, this "claim" also suffers from an insurmountable and obvious variance problem.  The non-processable claims described in the letters were for tax periods 1982 to 1986 and 1989 to 1991, and the "claims" were filed before February 11, 1997, meaning they preceded by more than three years the plaintiff's decision to redetermine its 1992 bad-debt reserve, which redetermination led to the purported NOL and claimed deduction at issue.  It is simply impossible that the earlier "protective claim" for those years, even if eventually filed, held open the statute of limitations for a 1992 NOL carryback which the plaintiff would not conceive for three more years.

4669963.1

AmBase in June 1995.  They do not.

"[T]he Second Circuit has described 'a satisfactory informal claim' as a writing that "at least alert[s] the IRS that the taxpayer seeks a refund and [] also indicate[s] the grounds upon which the taxpayer's claim is based."  *See Weisman v. Commissioner of Internal Revenue*, 103 F. Supp. 2d 621, 628 (E.D.N.Y. 2000), *quoting Forma*, 42 F. 3d 759, 767 n.13 (2d Cir. 1994); *see also Magnone v. United States*, 733 F. Supp. 613, 618 (S.D.N.Y. 1989) ("The informal claims doctrine allows certain less formal written claims to constitute notice within the statute of limitations if the claims sufficiently communicate the nature of the refund being sought.").

AmBase's allegation that it made an informal claim for refund aside from the purported 1120X must also fail as a matter of law.  AmBase fails even to allege that it made such a claim in writing to the IRS, which is a requirement for any informal claim.  Instead, it alleges that the "written component" of the informal claim is contained in certain IRS records enumerated in its interrogatory response.  *See* Ex. 3 (Response to Inter. 3).  There is no authority in the Second Circuit to suggest that a taxpayer's failure to submit even an informal claim in writing to the IRS can be remedied by the notes and records of the IRS itself.  It is not enough that the recipient of an *oral* claim took notes, and even that much assumes far more than the records here indicate.

Even if AmBase could rely upon the records it enumerates in its interrogatory responses as the written component of an informal claim, those records did not "alert[] the IRS that the taxpayer [sought] a refund and . . .  indicate the grounds upon which the taxpayer's claim [was] based."  *See Weisman v. Commissioner of Internal Revenue*, 103 F. Supp. 2d 621, 628 (E.D.N.Y. 2000), *quoting Forma*, 42 F.3d 759, 767 n.13 (2d Cir. 1994).  AmBase relies upon the Revenue Agent Report ("RAR") of May 13, 2003, that described the disallowance of AmBase's March

2000 claim for refund, and the notes and meetings referenced therin.[16]  The relevant portion of

the 2003 RAR states as follows:

> AmBase had not provided any contemporaneous records to indicate that it in fact made a valid informal claim.  It provided a billing record for a meeting on May 29, 1997 with the IRS.  The notes on this billing record state "meeting w/IRS & prepFU w/JohnF. and Meeting w /IzzyJon re: amended Trs etc."  Then Team Manager Salvatore Massotto's calendar for May 29, 1997 indicates that the IRS meeting was to go over the proposed RAR and provide it to AmBase.  At no time was the possibility of filing amended returns for 1992 raised.
>
> Salvatore Massotto's records also indicate that he contacted the Technical Advisor and Lou Manheim of the Joint Committee on January 22, 1996 with respect to this case.  The history sheets (Form 4451 Quarterly) indicate that there was a discussion about an 1120X with reference to an AMT NOL carryback (8812-9112) and the IRS procedures if such Form 1120X were to be filed.

*See* Ex. 8.  Nothing in the RAR supports AmBase's assertion that it made an informal claim with

respect to Carteret's addition to its reserve for bad debts.  The notes related to the meeting of

May 29, 1997, appear to relate to the RAR issued by the IRS that described the disallowance of

the capital loss deduction described above.  The RAR does not reflect that the contact between

the IRS and a Congressional committee concerned the bad debt issue.  Finally, the Form 4451

history notes, attached and incorporated in the United States' motion, state only that AmBase

"*will be* filing a protective claim Form 1120X for the years 8812 - 9912 with the service center to

correct the NOL carrybacks and carry-forwards once a decision is reached in tax court on the

1985-1987 years."  *See* Ex. 9. (emphasis added).  The notes do not state that AmBase *did* file the

Form 1120X.  The notes also reiterate the claims made in AmBase's Form 1120X produced in

---

[16]The Revenue Agent Report described the denial of AmBase's March 2000 claim for refund.  It also found that AmBase failed to make an informal refund claim in June 1995.

discovery but not filed with the IRS: if the Supreme Court had ruled differently in *Atlantic Mutual*, and AmBase had won its Tax Court case in November 1999 rather than enter an agreed decision to increase its tax year 1987 income, AmBase had at least considered filing a claim to protect net operating loss carryback and carryforward to tax years 1988 through 1991.  AmBase, however, did not prevail in its Tax Court case, and agreed to the disallowance of the capital loss deduction.  Its Form 1120X of June 1995, even if filed, was useless.  Nothing in the IRS records enumerated in AmBase's interrogatory responses suggests that it made an informal claim to consolidate Carteret and redetermine its bad debt reserve additions to generate a NOL carryback for the parent to tax year 1989.

CONCLUSION

AmBase cannot invoke the jurisdiction of this Court to maintain its civil action for refund.  AmBase failed to file a claim for refund with the IRS raising the grounds sought to be litigated in this action within the applicable period of limitations under § 6511(c) and cannot rely on the special seven-year period of limitations with respect to bad debts under § 6511(d)(1).  For these reasons, the United States moves the Court to dismiss the above-captioned civil action.

NORA DANNEHY
United States Attorney

*/s/Alex T. Case*
ALEX T. CASE
Federal Bar No. phv03099
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 55, Ben Franklin Station
Washington, D.C. 20044-0055
Tel: (202) 307-6499 / Fax: (202) 514-5238
Email: Alex.T.Case@usdoj.gov

4669963.1

CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2009, a copy of the foregoing DEFENDANT

UNITED STATES' MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS was filed

electronically and served by mail on anyone unable to accept electronic filing.  Notice of this

filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or

by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic

Filing.  Parties may access this filing through the Court's CM/ECF System.


I further certify that on September 28, 2009, I mailed a paper courtesy copy of the

foregoing  DEFENDANT UNITED STATES' MEMORANDUM IN SUPPORT OF ITS

MOTION TO DISMISS to the Court at the address listed below, as required by the Court's

Electronic Filing Order (Doc. Ent. 3):

> The Honorable Warren W. Eginton
> Senior United States District Judge
> District of Connecticut
> Brian McMahon Federal Building
> United States Courthouse
> 915 Lafayette Boulevard - Suite 335
> Bridgeport, Connecticut 06604

> */s/Alex T. Case*
> ALEX T. CASE
> Trial Attorney, Tax Division
> U.S. Department of Justice
> P.O. Box 55, Ben Franklin Station
> Washington, D.C. 20044-0055
> Tel: (202) 307-6499
> Fax: (202) 514-5238
> Email: Alex.T.Case@usdoj.gov

4669963.1