IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

AMBASE CORPORATION        )
                                    )
               Plaintiff,       )
                                    )
       v.                  )      Case No. 3:08CV651-WWE
                                    )
UNITED STATES OF AMERICA,   )
                                    )
            Defendant.     )

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS AND IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

      Plaintiff AmBase Corporation ("AmBase") seeks a refund of an overpayment of federal income tax and interest. This Court has jurisdiction in this case because AmBase has filed a timely and adequate refund claim and has satisfied the requirements of 26 U.S.C. §§ 7422(a), 6532(a), and 6511(a) and (d).

## QUESTIONS PRESENTED

1.    Whether Defendant has filed a proper motion to dismiss.

2.    Whether 26 C.F.R. §§ 1.593-5(b)(2) and 1.593-6A(a)(1) permit AmBase to change its bad debt reserve deduction from the deduction claimed on its original 1992 tax return.

3.    Whether, under the seven-year statute of limitations for bad debts in 26 U.S.C. § 6511(d)(1), AmBase's March 2000 claim for refund arising from an increase in its 1992 deduction for bad debts was a timely claim for refund.

4.    Alternatively, whether a valid protective claim for refund was timely filed under the three-year statute of limitations under 26 U.S.C. § 6511(a).

## INTRODUCTION

Plaintiff AmBase brings this action for recovery of $7,162,875 in federal income tax for the tax year 1989 (or such greater amount allowed by law), plus interest. Compl. 22. This overpayment of tax that AmBase paid results from an increased net operating loss ("NOL") deduction carried back to 1989 from AmBase's consolidated federal income tax return for the tax year ending December 31, 1992, under 26 U.S.C. § 172. Plaintiff's Local Rule 56(a)1 Statement ("LR56") ¶ 21. AmBase's 1992 increased NOL deduction is attributable to bad debt losses incurred by AmBase's wholly-owned subsidiary, Carteret Savings Bank F.A. and its subsidiaries (collectively "Carteret"), and by Carteret's successor, Carteret Federal Savings Bank ("New Carteret"). LR56 ¶ 22. As explained below, the bad debt losses are the same as reported by Defendant on state income tax returns filed on behalf of Carteret and New Carteret for 1992 after the RTC seized Carteret and all of its business records. LR56 ¶ 85; Exs. B, C, and D. For all relevant tax years, AmBase filed a consolidated federal income tax return for an affiliated group of corporations ("AmBase Group") that included Carteret. LR56 ¶ 20.

Defendant has asserted three defenses in this case. The first is that AmBase did not file a timely and adequate refund claim with the Internal Revenue Service ("IRS"), a jurisdictional prerequisite to AmBase's filing its complaint in the case. This jurisdictional issue is the subject of Defendant's motion to dismiss. Defendant's other two defenses are that AmBase failed to substantiate its bad debt deduction and that Carteret may have had unreported Federal Financial Assistance income. Although Defendant has made these substantiation arguments generally, it has never articulated in what way AmBase's substantiation is insufficient and has failed to respond to any discovery on these issues. Defendant's substantiation assertion is particularly puzzling because the support for AmBase's tax return items is Defendant's own analysis of

Carteret's bad debts and financial condition. LR56 ¶¶ 79, 85-87. But, these substantiation issues are not covered by Defendant's motion to dismiss or AmBase's motion for summary judgment, and their resolution will wait for another day.

Defendant's motion to dismiss is procedurally defective because it relies on extensive assertions of fact, many of which AmBase disputes, that are beyond the complaint. Defendant's motion should have been filed as a motion for summary judgment, with appropriate record citations to support the factual assertions. Despite this problem with Defendant's motion, AmBase would like the Court to rule on the jurisdictional issues. To further that objective, AmBase has filed its own motion for summary judgment and suggests that the Court convert Defendant's motion to a motion for summary judgment.

The issues in Defendant's motion relating to AmBase's ability to change its bad debt deduction from the amount claimed on the original tax return, and relating to AmBase's filing of a timely refund claim within the seven-year statute of limitations for bad debts, present purely legal questions, for which there are Treasury Regulations, an IRS Revenue Ruling, and a case directly on point. 26 C.F.R. §§ 1.593-5(b)(2) and 1.593-6A(a)(1); Rev. Rul. 70-5, 1970-1 C.B. 142; *Smith Electric Co. v. United States*, 461 F.2d 790 (Ct. Cl. 1972). AmBase's alternative argument that it filed timely protective claims within the general three-year statute of limitations is a mixed question of fact and law. AmBase has presented undisputed facts with its motion for summary judgment that it believes require a decision in its favor on this alternative argument. If the Court disagrees, however, additional discovery is needed. Defendant has refused, however, to respond to discovery. Accordingly, AmBase has accompanied its motion for summary judgment with a Motion to Compel Discovery on the three-year statute issue. The Motion to

Compel, and the entire three-year statute issue, will be moot if the Court rules that AmBase complied with the seven-year statute for bad debts.

## BACKGROUND

*Government seizure of Carteret*

The procedural problems in this case can be traced back to the Government's actions on and after December 4, 1992. On that day, the U.S. Office of Thrift Supervision ("OTS") placed Carteret into receivership and the Resolution Trust Corporation ("RTC") seized Carteret's office premises and all of its business records. LR56 ¶¶ 6-7. As part of the conservatorship, Carteret Federal Savings Bank ("New Carteret") was created. LR56 ¶ 9. New Carteret succeeded to and continued Carteret for tax purposes.[1] LR56 ¶ 10. The RTC was the receiver until the end of 1995. LR56 ¶ 12. The FDIC became the receiver as of January 1, 1996, and remains so to this day. LR56 ¶ 12. Through all this time, the RTC and subsequently the FDIC ran New Carteret and had possession of all the business records of Carteret and New Carteret. LR56 ¶¶ 7, 12, 13, 17, 33, 45, 97, 98, 102. Various agencies, including the OTS, RTC and FDIC took part in the seizure and/or subsequent conservatorship. LR56 ¶ 8. For the sake of convenience the agencies are referred to as the Federal Agencies. AmBase's only access to records came through what it had retained before the seizure and from documents made available by the Federal Agencies. LR56 ¶ 18. Stated charitably, these bureaucracies were less than cooperative in providing

---

[1] Under 26 C.F.R. § 1.597-4(d)(1), the "Bridge Bank" (New Carteret) "succeeds to and continues the transferring Institution's [Carteret's] taxable year." On April 23, 1992, the IRS issued proposed regulations (57 Fed. Reg. 14804 (Apr. 23, 1992), 1992-1 C.B. 1037) under 26 U.S.C. § 597, providing guidance for domestic building and loan associations in connection with the receipt of Federal Financial Assistance. After revisions, final regulations for 26 U.S.C. § 597 were issued on December 20, 1995 (T.D. 8641, 1996-1 C.B. 103), that are generally effective for taxable years ending on or after April 22, 1992. 26 C.F.R. § 1.597-7(b).

information to AmBase.  For a period of many years, AmBase's Chief Financial Officer wrote dozens of letters, made dozens of telephone calls, and made trips crisscrossing the country in an effort to locate records for Carteret and New Carteret.  LR56 ¶¶ 82-83, 97; Ex. M pp. AMB-TX-001477-001485.  The agencies kept AmBase in the dark regarding New Carteret for many years, even though the information was essential to AmBase's Federal income tax filing obligations and liabilities.  *Id.*

***Tax considerations and uncertainties re AmBase's 1992 tax return***

Despite the non-cooperation of the Federal Agencies, AmBase was obligated to do the best it could in filing its consolidated Federal income tax return for 1992.  The information the agencies withheld from AmBase was essential because New Carteret and Carteret are a single entity for Federal income tax purposes and are required to file a single, combined income tax return.  26 C.F.R. § 1.597-4(e).  Because Carteret had been part of AmBase's consolidated group, New Carteret also had to be included in AmBase's consolidated income tax return unless AmBase made an election under Defendant's regulations to disaffiliate New Carteret.  26 C.F.R. § 1.597-4(f).  At the time AmBase filed its tax return, however, AmBase had sparse facts concerning New Carteret and therefore little knowledge of how the inclusion of New Carteret would affect its consolidated tax liability.  LR56 ¶¶ 33-34.  Furthermore, Defendant had not yet finalized the regulations that would provide some measure of certainty regarding how inclusion of New Carteret would affect AmBase's return.  Defendant did not finalize the regulations until December 20, 1995.  *Supra*, n. 1.  In the absence of final regulations, and because of its general lack of information regarding New Carteret, AmBase made a tentative decision to disaffiliate New Carteret.  The tentative election clearly stated that AmBase reserved the right to remain

affiliated after it had a chance to analyze the effect of the regulations after they became final. LR56 ¶ 50; Ex. A.

In the summer of 1993, as it was preparing its consolidated tax return for 1992, AmBase had to take into account a number of other tax planning considerations with respect to Carteret (including New Carteret). LR56 ¶ 23. First was the amount of bad debt deduction to claim for Carteret. LR56 ¶ 24. As described below, under the bad debt calculation method that applied to Carteret, AmBase needed to select an amount from the range of allowable bad debt deductions produced by the applicable experience method formula. LR56 ¶ 25. This decision depended not just on the amount of income of Carteret and other companies included in the AmBase Group consolidated return, but also the amount of NOL of AmBase Group (*i.e.,* the excess of deductions of the AmBase Group over income) that was needed to carry back to earlier years to reduce taxable income in those years. LR56 ¶ 26. At the same time, AmBase did not want to claim a bad debt deduction for Carteret that produced more NOL than could be used in prior years. LR56 ¶ 27. Moreover, AmBase needed to consider the alternative minimum tax ("AMT") effect of all these questions.[2] LR56 ¶¶ 28-29.

In weighing these considerations, AmBase had to deal with at least three major uncertainties about its tax situation, in addition to the decision whether to include New Carteret in the 1992 consolidated return, and the uncertainty caused by the lack of information about Carteret's 1992 business operations. AmBase could not make a reasoned analysis of the effects of a disaffiliation election without those records. LR56 ¶¶ 31-34. One uncertainty stemmed

---

[2]In addition to the regular tax, corporations such as AmBase also are subject to the AMT regime of the Internal Revenue Code, which amounts to a separate, parallel tax system, with its own set of rules for determining income and deductions, tax rates, and determination, application and carryover of NOLs. *See* 26 U.S.C. §§ 55 to 59.

from the fact that, with respect to tax year 1987, the IRS was asserting a significant additional tax liability for AmBase based on an issue related to the Home Insurance Company, another member in AmBase's consolidated group.[3]  LR56 ¶¶ 35-40.  Another uncertainty was the IRS's audit of AmBase's income tax returns for tax years 1988 through 1991, which included a review of AmBase's bad debt deductions as well as tax liability for 1992 because of the NOL carryback to 1989.  LR56 ¶¶ 41-42.  Finally, AmBase was uncertain whether the IRS would accept the 1992 return as filed in its audit or propose adjustments to increase or decrease taxable income. LR56 ¶ 43.  The proposed adjustment to AmBase's 1987 tax, and any adjustments proposed for subsequent years, all affected the amount of NOL carryback from 1992 that could be used in earlier years, as well as the application of AMT credits and other carryovers to the various years. LR56 ¶¶ 44-45.

***AmBase files its original 1992 consolidated federal income tax return.***

On August 30, 1993, AmBase timely filed its original 1992 consolidated return, even though the Federal Agencies still had not provided AmBase access to all of its books and records for Carteret.  AmBase included only Carteret in the return (*i.e.*, for the period from January 1 through December 4, 1992), and did not include New Carteret (*i.e*, its bad debts and tax loss for the period December 4 through December 31, 1992).  LR56 ¶ 46.  The return included numerous schedules for Carteret which were clearly labeled as covering the period "1/1/92 - 12/4/92," and included no schedules for New Carteret.  LR56 ¶ 47.  The original return also included a tentative

---

[3]  This proposed liability stemmed from a casualty insurance industry issue arising under a legislative transition rule; AmBase, like many insurance taxpayers, contested the proposed additional tax in the U.S. Tax Court.  Ultimately, the U.S. Supreme Court resolved the issue unfavorably to the industry, *Atlantic Mutual Ins. Co. v. Commissioner*, 523 U.S. 382 (1998). AmBase's 1987 case was resolved in 2000, after AmBase paid a substantial deficiency. LR56 ¶¶ 38-40.

election to disaffiliate New Carteret under Proposed Treasury Regulation § 1.597-4(g), *i.e.,* not to include New Carteret in the 1992 AmBase consolidated return.  LR56 ¶ 49; Ex. A.  Because the proposed regulations did not permit making a binding election until the final regulations were issued, this tentative election notified the IRS that AmBase reserved the right to reexamine its tentative decision to disaffiliate after the governing regulations became final.  LR56 ¶¶ 49-50.

AmBase's original 1992 tax return reflected a bad debt deduction for Carteret of $56,005,961.  LR56 ¶ 80.  Based upon bad debt charge-offs of $100,187,650 for Carteret (*i.e.*, for the period January 1 to December 4, 1992), the bad debt formula of the Treasury regulation produced a range of allowable bad debt deductions up to $101.5 million.  LR56 ¶¶ 77-79.  The bad debt formula, AmBase's decision as to how much to deduct within the allowable range of possible bad debt deductions, and the 1992 NOL carryback to 1989, necessarily all would change in the event AmBase filed an amended return to include New Carteret after the disaffiliation regulations were finalized.

***AmBase takes procedural protective actions.***

Because of the uncertainties and unresolved issues affecting AmBase's 1992 tax situation, AmBase took a number of procedural steps to protect its rights so that ultimately it would pay only its proper tax liability for 1992, 1989, and other affected tax years.  LR56 ¶¶ 103-125.  Final regulations issued in December 1995 generally provided a May 31, 1996 deadline for electing to disaffiliate with respect to conservatorships such as New Carteret's.  26 C.F.R. § 1.597-4(g).  Awaiting Carteret records from the Federal Agencies, AmBase made three written applications, and the IRS National Office issued three private letter rulings extending the May 1996 deadline.  LR56 ¶¶ 95-96.  AmBase's extension requests put the IRS on notice that the Federal Agencies were withholding records and that AmBase would file an amended return if it

chose to affiliate with New Carteret. LR56 ¶¶ 97-98. AmBase's CFO included a declaration with the letters stating that AmBase could not make a reasoned disaffiliation election because it still needed, but had not obtained from the Federal Agencies, "All of the post-December 4, 1992 [New Carteret] tax information, **in order for AmBase to correctly prepare/amend its 1992, 1993, 1994, 1995 and beyond tax returns**, if AmBase elects to have [New Careret] remain consolidated with AmBase." LR56 ¶ 98; Ex. M, p. AMB-TX-001480 (emphasis added).

The IRS allowed AmBase the three extensions in order to give AmBase additional time to consider whether to include New Carteret in its consolidated return beginning in 1992. It was well-understood by the IRS, both the National Office and the Revenue Agent who was auditing AmBase's 1992 return,[4] that a decision to affiliate would require an amended return for 1992, and by necessity, change the 1992 NOL carried back to 1989. The request letters made this abundantly clear. LR56 ¶¶ 97-100; Ex. M pp. AMB-TX-001443-497, Ex. N, pp. AMB-TX-001512-516.

The last extension provided by the IRS for AmBase to make an election to disaffiliate expired on April 30, 1997. LR56 ¶ 96. By letter dated April 28, 1997, AmBase notified the Federal Agencies and the IRS of its decision ***not*** to elect to disaffiliate New Carteret. LR56 ¶ 99. Although this decision required AmBase to file an amended return for 1992 to include New Carteret's December 1992 operations (including its bad debts) that were not included on the original tax return, the letter informed the IRS that despite repeated requests by AmBase, the

---

[4] The CFO's declaration referenced above that was attached to the extension request letter also explained that "The IRS agent (Mr. Sheldon ("Shelly") Meiner - downtown New York office), who is currently auditing AmBase's 1992 federal income tax return, and who is eager to close the 1992 audit year, is frustrated that no one has been able to obtain the short period December 5, 1992 to December 31, 1992 [New Carteret] tax return." LR56 ¶ 98; Ex. M p. AMB-TX-001479.

Federal Agencies had not yet provided the Carteret records necessary for AmBase to correctly prepare the amended 1992 return. LR56 ¶¶ 101-102. The letter notified the IRS, however, of AmBase's intent to comply with its obligation to file an amended 1992 return when the information became available. *Id*.

In addition, AmBase prepared a protective claim for refund, signed and dated June 6, 1995. LR56 ¶ 105. Substantial circumstantial evidence supports AmBase's assertion that this claim was duly filed with the IRS personnel in June 1995. LR56 ¶¶ 103-129. Further, documents in the IRS's own files indicate that AmBase placed the IRS on notice numerous times that its 1989 tax liability could be affected, and a refund due, once the many tax contingencies affecting the amount of the carryovers and carrybacks to 1989 from other tax years had been resolved. LR56 ¶¶ 102-125. For example, in an official IRS report regarding the refund claim at issue in this case, an IRS agent noted that a history sheet dated June 30, 1995, in the IRS's files had the following entry: "AmBase informed the Team Coordinator that it would file a protective refund claim for the 1988 through 1991 taxable years with respect to NOL carrybacks and carryforwards after the Tax Court matter for 1985-1987 became final." LR56 ¶ 121; Ex. R, p. AMB-TX-001213. The same official report refers to another history sheet notation of IRS Agent Salvatoro Massotto explaining that he had discussed an "1120X with reference to an AMT NOL carryback (8812-9112) and IRS procedures if such Form 1120X were to be filed." *Id.* (AMB-TX-001213). An 1120X is an amended tax return, and the Joint Committee does not get involved with tax cases unless there is a refund of tax. 26 U.S.C. § 6405. Accordingly, there is no doubt based on these IRS notations that the IRS line agents were aware that an amendment to the 1992 return, when the Federal Agency information became available, would result in a refund in the 1988 to 1991 cycle which they were auditing at the time.

The FDIC also took protective actions on behalf of AmBase. In accordance with its routine practice, on September 19, 1996, the FDIC filed a protective claim for refund of carryback to years including 1989. LR56 ¶¶ 126-135.

AmBase's final protective action came in March 2000. At that time, AmBase filed amended returns for tax year 1992 and 1989. LR56 ¶¶ 87-92. These returns served two purposes: (1) the returns perfected the claims filed earlier; and (2) the returns complied with the seven-year statute of limitations that applies to tax refunds resulting from bad debt deductions. AmBase eventually received some information from the Federal Agencies, including state income tax return filings that were filed for New Carteret by RTC. LR56 ¶¶ 85-86. The state income tax returns contained pro-forma federal income tax returns reporting the total charge-offs for qualifying and nonqualifying loans of $118,755,087 for the year 1992, including December. *Id.* Based on the new information in the state income tax returns and various other internal financial records obtained only after the original 1992 return was filed, the March 2000 claim included New Carteret's December 1992 items. LR56 ¶ 87. The amount of the bad debts AmBase claimed in the March 2000 refund claim, as well as all the other items of taxable income (including the absence of an Federal Financial Assistance income) are based on the Federal Agencies' own records, and thus are substantiated by the Federal Agencies. LR56 ¶¶ 85-86.

### *The Bad Debt Reserve*

The argument Defendant has made concerning AmBase's discretion to amend the bad debt reserve reported for Carteret requires an explanation of the Internal Revenue Code's bad debt provisions. As a Thrift, Carteret was entitled to a tax deduction for "a reasonable addition to a reserve for bad debts." 26 U.S.C. § 593(a) (1992). As it was entitled, Carteret determined its reasonable addition according to a formulaic bad debt method known as the experience

method.  26 U.S.C. § 593(b)(3).[5]  As in effect for the years in issue, this method applied

separately to what are known as qualifying real property loans (loans that are secured by real

property and meet other requirements) ("qualifying loans") and other loans known as

nonqualifying loans.  *See* 26 U.S.C. § 593(d)(1) and 26 C.F.R § 1.593-11(b) and (c).

The experience method took into account Carteret's history of loans that became

worthless and were charged off, according to Federal Agencies' standards, on Carteret's books.

The charge-offs were the amounts of bad debts "sustained during the taxable year."  LR56 ¶ 53;

26 U.S.C. § 585(b)(2)(A).  The experience method was based on a ratio of charge-offs to total

loans outstanding.  26 U.S.C. § 585(b)(2).

The first step under the experience method was calculation of the "Loss Experience

Factor" – the total charge offs in the current year and five prior years, divided by the sum of

balances of loans outstanding at the end of each of those six years.  26 U.S.C. § 585(b)(2).  The

Loss Experience Factor represented the portion of loans currently outstanding that could be

expected, based on recent average experience, to go bad.  Next, the Loss Experience Factor was

applied to the current year end balance of loans outstanding to determine the maximum year end

bad debt reserve for the current year.  *Id.*  Under the experience method, Carteret was entitled to

select any value for its year end reserve between the maximum value as determined in the prior

paragraph and a minimum value of zero.  The amount of Carteret's deduction under the

experience method was the amount needed to be added to the amount of the reserve at the

---

[5] The statutory provision applicable to a Thrift's bad debt reserves incorporates by
reference the statute section that contains the experience method applicable to banks.  *See* 26
U.S.C. § 593(b)(1) (incorporating the experience method in 26 U.S.C. § 585(b) for nonqualifying
loans); 26 U.S.C. § 593(b)(3) (incorporating 26 U.S.C. § 585(b) for qualified loans).

beginning of the current year to bring the year end reserve to the desired level, taking into account (*i.e.*, reducing the reserve by) the amount of charge-offs made during that year. *Id.*

After the Federal Agencies seized Carteret, they charged off an additional $18.6 million in loan losses incurred in the month of December 1992. LR56 ¶¶ 79, 85-86. These charge-offs increased the bad debt experience-based loss reserve for qualified loans to $54,179,188 and thereby increased the available addition to the bad debt reserve for qualified loans. LR56 ¶ 59. Based on this method, the maximum deduction for qualified loans was $93,083,002. LR56 ¶ 63. The deduction for nonqualifying loans, which did not change based on December activity, was $32,170,832. LR56 ¶¶ 64, 73, 88, 91.

The following chart shows how AmBase's accounting firm Grant Thornton calculated the determination of the $93,083,002 addition to its bad debt reserve for qualifying loans through December 31, 1992. This is the amount AmBase is claiming in this action and is based on information concerning December 1992 charge-offs that AmBase eventually obtained from the Federal Agencies. LR56 ¶¶ 55-63.

**Qualifying Loans – Determination of $93,083,002 Addition to Bad Debt Reserve**

| | | |
|---|---|---|
| **1. Loss Experience Factor** | | |
| | Total charge-offs for qualifying loans 1988-1992 | $375,312,881 |
| *divided by:* | Sum of year-end qualifying loan balances 1988-1992 | 24,624,275,391 |
| *equals:* | Loss Experience Factor – qualifying loans | 1.524158% |
| **2. Maximum Year End Bad Debt Reserve** | | |
| | 12/31/1992 Balance of qualifying loans | $3,554,696,140 |
| *times:* | Loss Experience Factor | 1.524158% |
| *equals:* | Maximum Year End Bad Debt Reserve – qualifying loans | $54,179,188 |
| **3. Addition to Reserve** | | |
| | 1/1/1992 Bad debt reserve for qualifying loans | $49,048,205 |
| *less:* | Charge-offs of qualifying loans during 1992 | (87,952,019) |
| *equals:* | Reserve (reserve deficit) before current-year addition | (38,903,814) |
| *plus:* | **Addition necessary to attain Maximum Year End Bad Debt Reserve (*i.e.*, the bad debt deduction)** | **93,083,002** |
| *equals:* | 12/31/1992 Bad debt reserve for qualifying loans | $54,179,188 |

As the chart illustrates, the experience method applicable to AmBase was a mathematical, mechanical method for determining the maximum and minimum bad debt reserve deductions. A change in a key input such as charge-offs during the current year would require a recomputation under the method. For example, an increase in the amount of charge-offs would directly affect the amount of deduction because the reserve addition is determined by reducing the opening reserve by the amount of current year charge-offs, as shown in part 3 of the above chart. In addition, a change in current year charge-offs would also affect the amount of the Loss Experience Factor, calculated in part 1 of the chart and applied in part 2.

The bad debt deduction AmBase reported in the March 2000 claim reflected the full

$118,755,087 in charge-offs during tax year 1992 that are corroborated by internal records

obtained from the Federal Agencies. LR56 ¶¶ 85-88. The amended return for 1989 thereby

claimed a refund of 1989 taxes based on an increased carryback of the 1992 NOL resulting from

the increased Carteret bad debt deduction. LR56 ¶ 88. If AmBase had failed to amend its 1992

return by filing a claim for refund, the charge-offs made by the Federal Agencies for New

Carteret for December 1992 would have been forever lost.

## SUMMARY OF ARGUMENT

The Court has jurisdiction over this case because AmBase timely filed multiple refund

claims that cover the issues raised in this litigation. 26 U.S.C. §§ 7422(a), 6532(a) and 6511(a)

and (d). AmBase filed a timely claim in March 2000 under the seven-year statute of limitations

for bad debts in 26 U.S.C. § 6511(a)(1). AmBase also filed both formal and informal claims

within the general three-year statute of limitations in 26 U.S.C. § 6511(a), and properly

supplemented these claims in March 2000. Defendant's arguments that these refund claims were

procedurally defective are without merit.

Defendant's contention that AmBase is precluded from changing its bad debt reserve

deduction is contrary to its own binding regulations (26 C.F.R. §§ 1.593-5(b)(2) and 1.593-

6A(a)(1)) and binding revenue ruling (Rev. Rul. 70-5, 1970-1 C.B. 142). It also is precluded by

collateral estoppel because the Tax Court reached a contrary conclusion in litigation between

AmBase and the IRS. *The Home Group, Inc. v. Commissioner,* 91 T.C. 265 (1988).

Defendant's contention that the March 2000 claim was not timely because the seven-year

statute of limitations for bad debts does not apply to taxpayers using the reserve method has been

rejected. *Smith Electric Co. v. United States,* 461 F.2d 790, 793-94 (Ct. Cl. 1972). Further,

-15-

Defendant has no real argument that the protective claim filed on behalf of AmBase by the

Federal Agencies was defective other than to assert that the claim could not be processed and

depended on future contingencies – arguments that have no relevance to protective claims. *E.g.*,

*United States v. Kales,* 314 U.S. 186 (1941). Defendant's other arguments relating to the content

of the claims and whether they were received by the IRS are based on Defendant's speculation

and should be rejected by the Court because Defendant has refused to respond to discovery

related to these issues.

## ARGUMENT

**I.**     *Defendant's motion improperly relies on extrinsic (and disputed) factual assertions not included in the complaint.*

Motions to dismiss a complaint cannot contain evidence extrinsic to the pleadings.

*Global Network Commc'ns, Inc. v. United States,* 458 F.3d 150, 155 (2d Cir. 2006); FED. R. CIV.

P. 12(d). If evidence is offered in a motion to dismiss that was not included in the pleadings, the

Court must either: (i) exclude the evidence if possible, or (ii) convert the motion to one for

summary judgment.[6] FED. R. CIV. P. 12(d); *Friedl v. City of New York,* 210 F.3d 79, 83 (2d Cir.

2000); *Sira v. Morton,* 380 F.3d 57, 66-67 (2d Cir. 2004). There are two narrow exceptions to

the rule. The first exception encompasses materials that are "integral to the complaint." *Global,*

458 F.3d at 156. For this exception to apply the "plaintiff[] [must] *rel[y]* on the terms and effect

of [the] document in drafting the complaint . . .; mere notice or possession is not enough." *Id.*

(emphasis in original) (quoting *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.

---

[6] It is not relevant that a particular factual issue is uncontroverted. If it is not contained within the pleadings, it cannot be considered in a motion to dismiss a complaint. *Kopec v. Coughlin,* 922 F.2d 152, 155 (2d Cir. 1991). If a court were to accept extraneous materials it considers "uncontroverted," it would deny the opposing party the "opportunity to controvert the submissions in the first instance." *Id.*; *see also Amaker v. Weiner,* 179 F.3d 48, 50 (2d Cir. 1999).

2002)). The second exception is for materials that are "an appropriate subject for judicial notice." *Global,* 458 F.3d at 156-57.

Here, Defendant's memorandum in support of its motion to dismiss runs afoul of these rules, extensively relying on information outside of the pleadings without qualifying for any exception. The memorandum also contains uncited assertions, the adjudication of which would require judicial fact finding and thus necessitates conversion or exclusion. In addition, Defendant cites numerous contested substantive propositions relating to the cases *Carteret Sav. Bank, F.A. v. Office of Thrift Supervision,* 963 F.2d 567 (3d Cir. 1992), and *AmBase Corp. v. United States,* 58 Fed. Cl. 32 (2003).[7] Neither of these cases are cited in the complaint, integral to the complaint, or incorporated into the complaint by reference. Accordingly, AmBase requests the Court to convert Defendant's motion to a motion for summary judgment with directions to Defendant to comply with the relevant procedural requirements for such a motion. *Sira v. Morton,* 380 F.3d at 66-67.

---

[7] The following is a sampling of some of the contested factual assertions Defendant's memorandum sources to extraneous case law.
- "The liabilities of both Delray and Barton exceeded their assets." Def.'s Mem. at 4.
- "Counting the excess liabilities of the acquired thrifts as supervisory goodwill was essential to treating Carteret as solvent because the excess liabilities of Delray and Barton exceeded Carteret's pre-acquisition net worth." *Id.* at 5.
- "[W]hen supervisory goodwill was not counted, Carteret failed to meet its risk-basked capital requirement." *Id.*
- "The OTS then began to issue directives to AmBase to infuse Carteret with enough capital to meet its requirements." *Id.*
- "At about the same time that AmBase struggled to keep Carteret afloat, the OTS discovered that the board of directors of AmBase has approved bonus payments and loan forgiveness to its corporate officers and directors from the proceeds of the Home Insurance Company sale." *Id.*
- "AmBase, however, failed to secure in time the financing required for the acquisition." *Id.* at 6.

**II.** ***AmBase was entitled by Defendant's own regulations and revenue rulings to change its bad debt reserve after filing its tax return. In fact, AmBase was required to change the bad debt reserve once the decision was made to include Carteret in the 1992 consolidated return.***

The underpinning of Defendant's motion to dismiss is its assertion that AmBase is stuck with the amount of the bad debt reserve it chose to deduct on its original tax return for 1992 and is forever precluded from changing that amount. According to Defendant, AmBase is bound by its choice regarding its bad debt reserve even though the purpose of Defendant allowing AmBase extra time to decide whether to include New Carteret in the consolidated return would require an amended return and change the bad debt deduction. Defendant's position is even more troubling because AmBase had attempted to determine its proper bad debt deductions by repeatedly requesting relevant information from Defendant (the Federal Agencies), but Defendant refused to provide AmBase with the necessary information until years after AmBase had to file the original 1992 return. More importantly, wholly apart from the obvious inequity of Defendant's argument, it is directly contrary to regulations specifically on point (which Defendant fails to cite). Treasury Regulations, at 26 C.F.R. §§ 1.593-5(b)(2) and 1.593-6A(a)(1), specifically allow AmBase to increase the bad debt reserve deduction reported on its tax return. The Tax Court has held in a case involving AmBase that these regulations are to be liberally construed, and that "there is no authority or discretion statutorily reserved to [Defendant] to deny [a taxpayer's] reserve addition election, so long as the taxable year is open." *The Home Group, Inc. v. Commissioner,* 91 T.C. 265, 270 (1988). These regulations are binding on Defendant. *See McCord v. Granger*, 201 F.2d 103, 106 (3d Cir. 1952).

AmBase was the petitioner in the *The Home Group* Tax Court case.  On May 19, 1989, The Home Group, Inc. changed its name to AmBase.  LR56 ¶ 2.  Therefore, as a legal matter, the Tax Court has determined that AmBase is not bound by the amount of bad debt deduction reported in its original tax return, and Defendant is collaterally estopped from contesting this issue.  *Montana v. United States*, 440 U.S. 147 (1979).  Collateral estoppel is "designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally."  *Commissioner v. Sunnen*, 333 U.S. 591, 599 (1948).  The doctrine applies when "(1) there was a full and fair opportunity to litigate the issue in the previous action; (2) the issue was actually litigated in that action; (3) the issue was lost as a result of a final judgment in that action; and (4) the person against whom collateral estoppel is asserted in the present action was a party or in privity with a party in the previous action."  *In re Palmer*, 207 F.3d 566, 568 (9th Cir. 2000) (quoting *Pena v. Gardner*, 976 F.2d 469, 472 (9th Cir. 1992); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979)); *see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 547 F.3d 109, 112 n. 1 (2d Cir. 2008).  Each of these requirements for collateral estoppel is satisfied here as to the legal issue whether AmBase is entitled to change its bad debt deduction from the amount claimed on its original 1992 tax return.

If the binding regulations and collateral estoppel were not enough, the IRS also has issued a revenue ruling conceding that 26 C.F.R. § 1.593-6A(a)(1) is broad in application and allows a taxpayer to increase its addition to its bad debt reserve without any limitation on the circumstances that prompted the taxpayer's desire to make a change.  Rev. Rul. 70-5, 1970-1 C.B. 142.  The revenue ruling, like the Treasury regulation, is binding on Defendant.  *Bankers Life & Cas. Co. v. United States*, 142 F.3d 973, 978 (7th Cir. 1998).

**A.  AmBase is entitled, and in fact required, under Defendant's explicit regulations to change its bad debt reserve.**

The regulations cited above, which Defendant fails to discuss, explicitly allow AmBase to correct the bad debt reserve if there is a subsequent adjustment to the tax return, whether the adjustment is initiated by the IRS or AmBase.  The regulations are broadly drafted to allow the taxpayer to increase its reserve and even change its method of calculating the reserve.  In fact, AmBase is not attempting to change its method of calculating the reserve, but rather is revising the reserve calculation to include Carteret's December 1992 charge-offs made by the Federal Agencies (information that was not available to AmBase at the time it filed its original consolidated income tax return for 1992).  The operative portions of the regulations provide for subsequent adjustments as follows:

> (2) *Subsequent adjustments*.  If an adjustment with respect to the income tax return for a taxable year is made, and if such adjustment (whether initiated by the taxpayer or the Commissioner) has the effect of permitting an increase, or requiring a reduction, in the amount claimed on such return as an addition to the reserve for losses on nonqualifying loans or to the reserve for losses on qualifying real property loans, then the amount initially credited to such reserve for such year pursuant to subparagraph (1) of this paragraph may have to be increased or decreased, as the case may be, to the extent necessary to reflect such adjustment.

26 C.F.R. § 1.593-5(b)(2).  The Thrift's right to make subsequent adjustments to the addition to reserves for qualifying loans is restated in 26 C.F.R. § 1.593-6A(a)(1).  This regulation makes it clear that the Thrift, by reporting a particular addition to its bad debt reserve on its original tax return, does not make a binding election as to either the method of the calculation or the amount of the reserve.

> For each taxable year the taxpayer must include in its income tax
> return for such year a computation of the amount of the addition
> determined under this section. The use of a particular method in
> the return for a taxable year is not a binding election by the
> taxpayer to apply such method either for such taxable year or for
> subsequent taxable years. Thus, in the case of a subsequent
> adjustment described in paragraph (b)(2) of § 1.593-5 which has
> the effect of permitting an increase, or requiring a reduction, in the
> amount claimed in the return for a taxable year as an addition to
> the reserve for losses on qualifying real property loans, the amount
> of such addition may be recomputed under whichever method the
> taxpayer selects for the purpose of such recomputation, irrespective
> of the method initially applied for such taxable year.

26 C.F.R. § 1.593-6A(a)(1).

Revenue Ruling 70-5, *supra*, leads to the same conclusion. AmBase has a much more compelling argument for adjusting its bad debt reserve than the taxpayer in that ruling. The taxpayer had claimed on its return a deduction (not related to its bad debt reserve) that either was not substantiated by evidence or did not comply with the controlling tax laws, and the IRS disallowed the erroneous deduction and increased the taxpayer's taxable income. In the ruling, the IRS allowed the taxpayer to completely offset the increased income by increasing its bad debt reserve. The taxpayer had complete access to all income and expense information necessary to prepare an accurate original return, while AmBase, on the other hand, was not able to determine the appropriate bad debt reserve when it filed its original return because a final decision on disaffiliation was not possible until the IRS issued final regulations. After final regulations were issued and AmBase decided to include New Carteret in the consolidated return for 1992, AmBase was required to amend its 1992 return and change its bad debt reserve calculation to reflect the New Carteret charge-offs (omitted in the original return) made by the Federal Agencies in December 1992. Moreover, the Federal Agencies had seized all of Carteret's business records and had refused to provide the information from December 1992 that AmBase

needed to calculate the appropriate reserve. Thus, at the time AmBase filed its original 1992

consolidated income tax return it could not have reported the correct bad debt deduction.

Defendant seeks to characterize AmBase's recomputation of its bad debt deduction as a

"third attempt to eliminate 1989 tax liability" (Def. Memo p. 7), suggesting that this is somehow

inappropriate. But, what AmBase is claiming is exactly the situation that 26 C.F.R. § 1.593-

5(b)(2) explicitly permits. The regulation allows a Thrift to increase its bad debt deduction

where the IRS's adjustment on another item "has the effect of permitting an increase … in the

amount claimed on such return as an addition to the reserve for losses . . . ."

In addition, if AmBase were not permitted to amend its original 1992 return to reflect the

December charge-offs of Carteret loans, it would permanently lose the ability to take those

charge-offs into account for tax purposes. This is because under the experience method

applicable for Carteret's bad debts, whether the taxpayer selects the maximum reserve or

minimum or something in between, the reserve addition is determined by reducing the opening

reserve by the amount of charge-offs for loans that become worthless in the current year. *See*

table, p. 14. The charge-offs are limited to "the total bad debts sustained during the taxable year"

(26 U.S.C. § 585(b)(2)(A)), and under the regulations must be charged to the reserve "for the

taxable year in which the bad debt occurs." If the December 1992 charge-offs are not offset

against the reserve for tax year 1992, they are forever lost. *See* 26 C.F.R. § 1.585-3(a)

**B.** **Defendant relies on cases that are inapposite.**

Defendant relies on two cases that are readily distinguishable. In *Wengel, Inc. v. United*

*States*, 306 F. Supp. 121 (E.D. Mich. 1969), the taxpayer attempted to update the reserve

estimate reported for financial statement purposes retroactively based on experience that was not

available at the time the tax return was filed. The court did not permit the reserve addition,

noting that "if a taxpayer were able to amend a prior return whenever he discovered that his estimate was not accurate and that it would be to his advantage to do so, the basic principle that income must be reported under the facts as they exist at the end of the tax year would be abrogated." *Wengel*, 306 F. Supp. at 123-24 (citations omitted). Unlike the taxpayer in *Wengel*, AmBase is not correcting its charge-offs reported for financial statement purposes based on subsequent experience. Rather, AmBase's claim is based on the charge-offs of Carteret loans made by the Federal Agencies in December 1992 – during the tax year – but not disclosed to AmBase until later. That is, AmBase's claim depends solely on facts that existed at the close of the taxable year. Moreover, unlike the discretionary bad debt estimate at issue in *Wengel*, AmBase's bad debt deduction here is based on the formulaic, mechanical reserve calculation for Thrifts, which the regulations permit Thrifts to adjust after the tax return has been filed. In AmBase's own prior litigation with the IRS, the Tax Court specifically noted that the reserve methodology prescribed in the Internal Revenue Code for Thrift institutions affords the taxpayer broad discretion to change its reserve estimate after reporting it on its original return: "Due to the congressionally permitted liberality and the broad discretion afforded to taxpayers in section 593, coupled with the effect of the parties' agreement and our opinion upon the reserve, we find that a reserve addition or reduction would not be untimely for consideration as part of the Rule 155 portion of this case." *The Home Group, Inc.*, 91 T.C. at 271.[8]

_____

[8] Rule 155 sets forth the tax calculation procedure that a taxpayer and the IRS typically agree to after the Tax Court has decided the case. *See* Tax Court Rule 155. In *The Home Group* case, AmBase (The Home Group's new name) sought to reduce its reserve deduction during this process because it was more advantageous for it to make an addition to its reserve in another tax year. The court held that it would have been permissible for AmBase either to increase or reduce the reserve deduction taken on its return because of the broad, congressionally permitted liberality afforded taxpayers subject to 26 U.S.C. § 593.

Defendant also relies on *Rio Grande Bldg. & Loan Ass'n v. Commissioner*, 36 T.C. 657 (1961), which pertained to tax years before the regulations that apply to AmBase were promulgated. In that case, the court held that a savings and loan could not retroactively add to its reserve an amount that it had failed to credit to a reserve on its system of books in a reasonable time. The court noted that such an adjustment would have permitted the taxpayer to avoid segregating capital for financial statement purposes but still enjoy the benefit of a tax deduction for an increase to the reserve. The *Rio Grande* case is distinguishable on its facts. Unlike Rio Grande, AmBase is attempting to conform its bad debt reserve to the financial statements (*i.e.,* the "frozen capital") prepared by the Federal Agencies and recorded for Carteret. Thus, the principle Defendant extracts from *Rio Grande* actually supports AmBase's deduction here. In any event, the *Rio Grande* case pre-dated the regulations that govern AmBase's situation. *See Rio Grande*, 36 T.C. at 667-68.[9]

### III. AmBase's March 2000 refund claim was timely filed within the seven-year statute of limitations in 26 U.S.C. § 6511(d)(1) that applies to bad debt deductions.

There is no dispute that AmBase filed a claim for refund in March 2000 that covers the bad debt issues that are at issue in this litigation. Defendant argues, however, that the **types of**

---

[9] Defendant also cites Rev. Rul. 75-560, 1975-2 C.B. 73, in a footnote, but provides an incorrect explanation of the ruling. *See* Def. Memo. p. 9, note 7. The ruling concerns a bank using the experience method provided in 26 U.S.C. § 585(b)(2) (at the time similar, but not identical, to AmBase's experience method). The IRS allowed the bank to amend its return to take a greater bad debt deduction – the maximum reserve addition – correcting an error in the bad debt reserve computation on the return. Rev. Rul. 75-560 actually supports AmBase's position; the bad debt deduction on AmBase's original 1992 return was in error because it did not include charge-offs made in December 1992 (because Defendant withheld that information from AmBase). Under the ruling AmBase is allowed to correct the error and take the maximum reserve addition, as it seeks to do in this case. Further, the ruling is contrary to Defendant's theory that the reserve addition a taxpayer takes on its original tax return constitutes a binding election and cannot thereafter be increased. Defendant perhaps implicitly acknowledges this by relegating the ruling to a footnote; however, Defendant's attempt to limit the ruling does not square with its facts.

bad debt issues raised by AmBase are not within the scope of the seven-year statute applicable to bad debts.[10]  Defendant cannot point to any language in the statute that supports its purported restrictions on bad debt claims.

The statute, 26 U.S.C. § 6511(d)(1), provides broadly for a seven-year limitations period for a deduction "on account of" any "debt which became worthless."  The only restriction recognized in the caselaw and in IRS rulings is based on the wording of the statute.  To be "on account of" bad debts, the refund claim must be for an increase in the bad debt deduction. *Indiana National Corp. v. United States,* 980 F.2d 1098, 1102 (7th Cir. 1992), *aff'g* 775 F. Supp. 281 (S.D. Ind. 1991); *Armstrong v. United States*, 681 F.2d 774, 778 (Ct. Cl. 1982); Rev. Rul. 55-523, 1955-2 C.B. 497.  By its argument, Defendant seeks to interpose a gloss on the statute, but points to no language to support that gloss.  Defendant first contends that the seven-year statute does not apply at all to a taxpayer that uses the reserve method for bad debts.  This contention was explicitly rejected in *Smith Electric Co.,* 461 F.2d at 793-94.  In that case, the court noted that a taxpayer using the reserve method is required to charge-off specific bad debts in the year they become worthless or a deduction will be forever lost.  *Id.* at 793.  Therefore, the court concluded: "it is abundantly clear that the language of this statute [26 U.S.C. § 6511(d)(1)] evidences a Congressional intent to make the special statute of limitations applicable to taxpayers using either the direct charge-off or the reserve method of accounting for bad debts."  *Id.* at 794.

_____

[10] For the year in issue, 26 U.S.C. § 166(a)(1) provided for a deduction of wholly-worthless bad debts and 26 U.S.C. § 166(a)(2) allowed a deduction for partially-worthless bad debts charged off during the year.  In addition, before 1986, 26 U.S.C. §166(c) had allowed, "in lieu of any deduction under subsection (a)," a deduction "for a reasonable addition to a reserve for bad debts."  The rule of 26 U.S.C. § 166(c) was repealed for taxpayers other than financial institutions as part of the Tax Reform Act of 1986, Pub. L. No. 99-514, § 805(a), 100 Stat. 2085, 2361 (1986).  Nevertheless, for the year in issue 26 U.S.C. § 593(a) allowed, in the case of Thrifts such as Carteret, "a deduction for a reasonable addition to a reserve for bad debts."

Apparently recognizing that its position on the reserve method has been rejected, Defendant couches its argument in a perceived restriction on AmBase's right to revise its bad debt reserve deduction "retroactively." In doing so, Defendant conveniently ignores the contrary law in 26 C.F.R. §§ 1.593-5(b)(2) and 1.593-6A(a)(1), discussed *infra,* which permits Thrifts to change their bad debt reserve deductions without limitation. Finally, Defendant seeks to add a restriction to the statute by arguing that the seven-year statute should be limited to debts discovered after the original tax return was filed, contending that Congress enacted the seven-year statute exclusively so that taxpayers could deduct newly-discovered bad debts. There is no support for this assertion. Legislative history indicates that Congress was concerned, at least in part, that taxpayers would be disadvantaged by the IRS's determining on audit that the taxpayer had selected the wrong year to claim a worthless bad debt. H.R. Rep. No. 2333, 77th Cong., 1st Sess. 44-45 (1942), reprinted in 1942-2 C.B. 372, 408-09. Congress was not concerned solely with newly-discovered bad debts.

In its attempt to rewrite the statute based on its perception of Congressional intent, Defendant would have this Court interject non-statutory factual qualifications on what should be a bright-line test for the statute of limitations. A timely claim for refund is a jurisdictional prerequisite for filing suit in court. When Congress enacts jurisdictional statutes, it generally does not include rules that would require detailed factual inquiry. Such an approach would force a court to conduct a trial to resolve factual issues prior to determining whether or not the court even has jurisdiction over the case. As a result, the statutes of limitations in 26 U.S.C. § 6511 are based generally on broad subject matters (*e.g.*, bad debts, foreign tax credits); they do not

contain restrictions contingent on the type of ambiguous factual distinctions that Defendant seeks to interject.[11]

Additionally, Defendant's attempt to narrow the seven-year statute of limitations based on a perceived purpose of the statute has been rejected in analogous circumstances in the context of the similar extended limitations period of 26 U.S.C. § 6511(d)(3) applicable to the foreign tax credit. *Bank of America v. United States*, 377 F.2d 575 (Ct. Cl. 1967); *Hart v. United States*, 585 F.2d 1025 (Ct. Cl. 1978). The issue in *Bank of America* was whether the extended statute applied to a taxpayer which chose to deduct foreign income taxes on its original return, but then changed its mind and sought a credit for the foreign taxes (unchanged in amount) after expiration of the three-year period of limitations in 26 U.S.C. § 6511(a). *Bank of America*, 377 F.2d at 575. The taxpayer pointed out that 26 U.S.C. § 901(a) specifically provided that the choice to take a deduction or a credit for foreign taxes may be made or changed at any time "before the expiration of the period prescribed for making a claim for credit or refund of the tax" and contended that under 26 U.S.C. § 6511(d)(3) the "period prescribed" for choosing was ten years. *Id.* at 577. Similar to its argument here, Defendant contended that the ten-year limitations period applied for purposes of determining the size of the foreign tax credit or deduction, but not for purposes of merely changing its election from a deduction to a credit. Siding with the taxpayer, the court concluded that the taxpayer's position was consistent with a "normal reading" of the statutory language (*Id.* at 578), *i.e.*, there was nothing in 26 U.S.C. §§ 901 or 6511 which indicated that

---

[11] Defendant's position also suggests that Congress intended to adopt a rule with dubious tax policy objectives. It would have been strange indeed for Congress to grant taxpayers an extended seven-year statute of limitations where they did not conduct the necessary due diligence to discover their bad debts before the tax return was filed, but impose a more stringent three-year statute of limitations for more diligent taxpayers that had identified all their bad debts, but deducted them in a year that the IRS considers incorrect.

the ten-year period does not apply to the choice of taking a credit versus a deduction, even if there was no change in the amount of foreign taxes. *See also Hart, supra* at 1028.

**IV.** *This Court also has jurisdiction to consider AmBase's refund claim because AmBase filed a timely claim within the three-year statute of limitations in 26 U.S.C. § 6511(a).*

Under 26 U.S.C. § 6511(a), the period of limitations for filing a claim for refund is three years from the time the return was filed or two years from the time the tax was paid. This period can be extended by agreement between the IRS and the taxpayer. 26 U.S.C. § 6511(c). Defendant asserts, and AmBase agrees, that a valid extension agreement was entered into in this case and that, if the seven-year statute of limitations for bad debts does not apply, AmBase had at least until March 31, 1998, to file a claim for refund for 1989. LR56 ¶ 137; Def. Memo p. 20. Contrary to Defendant's assertions, three protective claims for refund were timely filed prior to March 31, 1998, and these claims were properly perfected by a supplemental refund claim filed in March 2000. The three protective claims were: (1) a September 1996 claim filed by FDIC on behalf of AmBase; (2) a June 1995 claim delivered to the IRS; and (3) an informal claim for refund asserted repeatedly by AmBase from 1993 through 1998.

26 C.F.R. § 301.6402-2(b) provides that a refund claim should "set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof." Courts have recognized four situations where the formal requirements of 26 C.F.R. § 301.6402-2 are not legally necessary for a valid claim. *Computervision Corp. v. United States,* 445 F.3d 1355, 1363-65 (Fed. Cir. 2006). First, an informal refund claim is valid if it fairly apprises the IRS of the basis for the claim. *United States v. Kales,* 314 U.S. 186, 194 (1941). Second, a refund claim that omits a specific claim for relief is valid if the IRS understood the nature of the claim and acted on it. *Angelus Milling Co.*

*v. Commissioner*, 325 U.S. 293, 297-98 (1945). Third, a general claim for refund that could have been rejected as procedurally defective is valid if later perfected before it is formally disallowed by the IRS. *United States v. Andrews*, 302 U.S. 517, 524 (1938). Fourth, a taxpayer is permitted to perfect a timely refund claim to raise new legal theories germane to the original claim that depend on facts the IRS examined or should have examined. *Bemis Brothers Bag Co. v. United States,* 289 U.S. 28, 31, 33-35 (1933). The Second Circuit has held that a claim can be perfected to raise new legal theories based on facts known to the IRS even after the statute of limitations has run. *St. Joseph's Lead Co. v. United States,* 299 F.2d 348, 350 (2d Cir. 1962). One type of refund claim that falls within these exceptions is a "protective" claim that is contingent on future events. Summaries of the IRS's position on the validity of protective claims can be found in guidance to IRS employees prepared by IRS Chief Counsel. *See* Chief Counsel Advisory (CCA) 200848045 (July 17, 2008); General Counsel Memorandum 38786 (Aug. 13, 1981). Each of AmBase's three refund claims filed within the general three-year statute complied with the requirements for protective claims.

> ### A. FDIC filed a timely protective claim for refund on behalf of AmBase in September 1996.

In general, the common parent of a consolidated tax return group (AmBase in this case) is the sole agent authorized to act on behalf of the group for tax filings, including the filing of claims for refund. 26 C.F.R. § 1.1502-77. There is an exception to this exclusive agency rule in the case of claims for refund for consolidated groups that include financial institutions that are subject to a receivership. 26 C.F.R. § 301.6402-7(a), (b)(3) and (4), (e)(1) permits FDIC to file claims for refund for carrybacks on behalf of a consolidated group that includes a financial

institution in receivership.[12]  It is the routine practice of FDIC to exercise its authority under these regulations to file protective claims for refund to ensure that losses are carried back properly to consolidated return years that pre-date the receivership.  LR56 ¶¶ 133-135.  In this case, FDIC followed its routine practice and on September 19, 1996, filed timely protective claims for carrybacks on behalf of AmBase for a number of years, including 1989. LR56 ¶¶ 128-135.  Because protective claims are by their nature contingent on future events, they usually cannot be processed by the IRS until they are supplemented after the anticipated events occur.  In such a case the IRS may notify the taxpayer of the need to supplement the protective claim.  The IRS did so here by notifying FDIC that the IRS could not process the claims until they were supplemented with additional information.  LR56 ¶¶ 129-132.  AmBase followed the IRS's advice and perfected the claim for refund for 1989 by its March 2000 supplemental filing. LR56 ¶¶ 87-92.

Defendant acknowledges that a protective claim for 1989 was filed in 1996 (Def. Memo. p. 29 n.15), but asserts that the claim was not "valid" because it was not processible and, because the contingent events that made the filing necessary had not yet occurred, the protective claim could not have included the detailed grounds for recovery ultimately included in AmBase's supplemental 2000 claim.  These arguments are without merit.  First, Defendant's assumption that protective claims for refund have no legal validity if the IRS cannot process them without additional information is wrong.  As noted in IRS internal documents, the requirement that a claim state the grounds and supporting facts is liberally construed, partially for protective claims. As the IRS Chief Counsel stated in General Counsel Memorandum 38786, *supra,* "a refund

---

[12] The fact that FDIC may file a refund claim on behalf of a consolidated group does not mean that FDIC owns the right to the refund.  See preamble to the regulations, T.D. 8446, 1992-2 C.B. 306, 308.

claim can still be valid for purposes of the period of limitations even though the claim itself does not even come close to setting forth enough facts to establish that the taxpayer has actually overpaid its taxes." *See also, National Forge & Ordnance Co. v. United States*, 151 F. Supp. 937, 941 (Ct. Cl. 1957).

This is especially the case for protective claims, which, of necessity, are dependent on future contingencies. *E.g., Kellogg-Citizens Nat'l Bank of Green Bay v. United States*, 330 F.2d 635, 638-39 & n.4 (Ct. Cl. 1964). Thus, the fact that the IRS could not process the protective claim filed in 1996 until the many contingencies relating to AmBase's tax position were resolved is irrelevant. That is the very nature of protective claims.

Defendant's assertion that FDIC's protective claim has an obvious "variance" problem, because it could not have included within its scope AmBase's decision to redetermine its 1992 bad debt reserve, is without any factual or legal basis. It is true that we do not know exactly what the refund claim said, but that is only because Defendant has refused to produce the claim or respond to any discovery relating to the claim. AmBase has filed a motion to compel this discovery.[13] More importantly, we know that FDIC's claim for refund for 1989 could only have related to carryback claims because FDIC did not take over Carteret until 1992, and FDIC's authority to file a claim for 1989 was limited to carrybacks. 26 C.F.R. § 301.6402-7(a), (b), (e).

_____

[13] It is possible that Defendant will assert that the IRS has lost or destroyed FDIC's claim for refund filed on behalf of AmBase. In such circumstances, where Defendant has destroyed relevant documents, the proper remedy in a tax case is "to infer that the true facts are as alleged by the taxpayer." *Andrew Crispo Gallery, Inc. v. Commissioner*, 16 F.3d 1336, 1343-44 (2d Cir. 1994). In addition, an adverse inference can be made for spoliation of relevant evidence. *E.g., Byrnie v. Town of Cromwell*, 243 F.3d 93, 107-11 (2d Cir. 2001). In this case, spoliation sanctions are particularly appropriate because the IRS was on notice that relevant documents should be preserved. On April 23, 2002, AmBase's counsel informed the IRS representatives handling this case administratively that it was likely to be litigated and steps should be taken to preserve all documents, including those related to the timely filing of refund claims.

Once AmBase elected to include New Carteret in the consolidated return for 1992, the 1992 bad debt reserve was required to be recomputed. Therefore, any FDIC claim for 1989 must have been based on (1) a carryback claim (2) resulting from the inclusion of New Carteret in the consolidated return, (3) which necessitated a redetermination of the bad debt reserve. In any event, the degree of specificity in FDIC's refund claim is beside the point. All that was necessary for a valid protective claim was that: (1) the IRS be placed on notice that a carryback could be claimed after the various uncertainties relating to AmBase's tax liability were resolved; and (2) the protective claim was later perfected before the IRS formally disallowed the claim by sending a notice of claim disallowance in accordance with 26 U.S.C. § 6532(a)(1).[14] *See, e.g., United States v. Memphis Cotton Oil Co.,* 288 U.S. 62, 64-65, 70-71 (1933); *St. Joseph Lead Co., supra* at 350-51. These conditions were satisfied.

**B.      AmBase filed another protective claim in June 1995.**

AmBase has in its files a copy of a protective claim for refund signed and dated June 6, 1995. Substantial circumstantial evidence supports the conclusion that this claim was duly filed with the IRS at the close of the 1988-1991 audit in June 1995.

A copy of this protective refund claim was placed in the same file with AmBase's original tax returns for the tax years 1988 and 1989. LR56 ¶¶ 105-106. Only documents actually filed with the IRS were placed in this file. LR56 ¶ 107. The file is maintained by AmBase for availability for follow-up for issues arising in the course of AmBase's dealings with the IRS. *Id*. A copy of the signed and dated protective claim also was placed in a separate file labeled "Protective Claim" maintained by AmBase. LR56 ¶ 108. The date, June 6, 1995, that appears

---

[14] Chief Counsel Advisory (CCA) 200848045 (July 17, 2008) provides a good summary of the caselaw that establishes the taxpayer's right to supplement a general protective claim for refund, including *United States v. Andrews*, 302 U.S. 517 (1938).

on the refund claim also suggests that it must have been filed. That same day, AmBase signed a
Form 870, which waived restrictions on assessment of tax with respect to the tax years 1988
through 1991. LR56 ¶ 112. On May 19, 1995, AmBase previously had signed a Form 872
agreement extending the statute of limitations on assessment for the same tax years until
December 31, 1996. LR56 ¶ 117. AmBase believes that it filed the protective refund claim for
1989 at the same time it provided the Form 870 waiver and the Form 872 extension documents to
IRS revenue agents in June 1995. An IRS transcript indicates that the waiver and extension
forms were recorded in the IRS system of records on June 8, 1995, two days after the date
appearing on the protective refund claim and the Form 870. LR56 ¶ 112. The filing of a
protective claim at that time was appropriate because there were still pending many uncertainties
relating to carryback and carryforwards to 1989. LR56 ¶ 113. Therefore, it was desirable for
AmBase to file a protective claim at the close of the IRS audit for 1988-1991 to cover the
carryover and carryback effects from other unresolved tax years, and IRS documents
acknowledge that a protective claim would be filed. LR56 ¶ 123; Ex. S.

Defendant correctly points out that, in the Second Circuit, the circumstantial evidence
outlined above, however strong, may not be sufficient to establish that the signed and dated claim
for refund in AmBase's files was duly filed with the IRS. Direct evidence that the claim was
actually received by the IRS may be required. However, Defendant has objected to AmBase's
discovery requests intended to ascertain whether there is evidence that the IRS received
AmBase's protective refund claim in or about June 1995. AmBase has filed a motion to compel
this discovery.[15]

---

[15] Defendant's assertion that its official Certificate of Assessment establishes that the
1995 claim was not received by the IRS is of dubious value. The same certificate also fails to
record the March 2000 1992 amended return which Defendant concedes was received by the IRS.

-33-

**C.    AmBase filed a timely informal protective claim for refund.**

In addition to the two protective claims for refund for the carryback to 1989 discussed above, AmBase also filed a timely informal protective claim when AmBase repeatedly informed IRS personnel of its intent to file an amended return for 1992 and claim a carryback.  Numerous documents in the IRS's own files indicate that AmBase placed the IRS on notice repeatedly that 1989 tax liability could be impacted, and a refund due, once the many tax contingencies that could affect the amount of the carryovers and carrybacks to 1989 had been resolved. LR56 ¶¶ 119-125.

_Disaffiliation contingencies_.  AmBase attached Exhibit 6 to its consolidated income tax return for 1992 filed on August 30, 1993, which excluded New Carteret (for the period December 4 to December 31, 1992) from the return.  LR56 ¶ 93; Ex. A.  The exhibit notified the IRS that AmBase reserved the right to reexamine its tentative decision to disaffiliate after the governing final regulations were issued.  _See_ 26 C.F.R. § 1.597-4.  The IRS granted AmBase an extension of time to April 30, 1997, to make its final decision whether to elect to disaffiliate for tax year 1992.  LR56 ¶ 96.  By letter dated April 28, 1997, AmBase notified the Federal Agencies and the IRS (by a copy mailed directly and another attached to the 1996 tax return) of its decision not to elect to disaffiliate.  LR56 ¶ 99.  Because New Carteret's operations (including its bad debts) for December 1992 were omitted from the original return, the effect of this decision was that AmBase **was required** to file an amended 1992 return.  AmBase could not comply with this requirement, however, until it received the necessary information from the Federal Agencies which had seized Carteret's books and records.  Thus, AmBase's April 28, 1997 letter was notice to Defendant that AmBase had timely made the decision to include New Carteret in its 1992 return, and it is absurd for Defendant to contend that this letter was not also notice that AmBase

would file the refund claim necessary to implement that decision, after the Federal Agencies provided the necessary documents.

1988-1991 audit/Tax Court litigation contingencies. In 1995, at the close of the IRS audit that included tax year 1989, AmBase informed the IRS that amended returns may be necessary to correct the carryovers and carrybacks to 1989 once the Tax Court litigation for 1987 was resolved. If AmBase lost this litigation, a 1987 carryover to 1989 could be disallowed. This, in turn, could make a carryback from 1992 to 1989 allowable. IRS documents confirm that AmBase notified the IRS of its intent to adjust its carryovers after the Tax Court case was resolved. An IRS Form 4451 states: "Taxpayer will be filing a protective claim Form 1120X for the years 8812-9112 with the service center to correct the NOL carrybacks and carryforwards once a decision is reached in tax court on the 1985-1987 years." LR56 ¶ 123; Ex. S pp. US002720, US002727, US002732. Other IRS documents also confirm that the IRS knew that AmBase had made a claim that carryovers and carrybacks needed to be corrected after the uncertainties were resolved. LR56 ¶ 124; Ex. T. Another IRS document indicates that IRS personnel specifically discussed AmBase's refund claim for a carryback to 1989 through 1991 with an IRS technician responsible for refund claims that are reviewed by the Joint Committee. LR56 ¶ 123; Ex. R, p AMB-TX-001213.

As these internal IRS documents confirm, AmBase repeatedly placed the IRS on notice that it intended to file an amended 1992 tax return claiming a refund due to available carrybacks after the numerous tax contingencies had been resolved.[16] Under these circumstances, these documents satisfy the criteria for a valid informal claim.

---

[16] In addition, Defendant has failed to produce some of the IRS documents that discuss AmBase's informal claim for refund and this failure is covered by AmBase's Motion to Compel.

The purpose of the refund claim requirement is "both to prevent surprise and to give adequate notice to the Service of the nature of the claim . . . thereby permitting an administrative investigation and determination." *Union Pacific R.R. Co. v. United States*, 389 F.2d 437, 442 (Ct. Cl. 1968) (citation omitted). Informal claims for refund that do not comply with all of the technical requirements of 26 C.F.R. § 301.6402-2 have long been recognized as valid if they provide the IRS with adequate notice of the nature of the taxpayer's claims. Courts uniformly hold that informal claims serve to toll the statute of limitations until the filing of a formal claim. *United States v. Commercial Nat'l Bank of Peoria,* 874 F.2d 1165, 1170 (7th Cir. 1989). The Court of Federal Claims has described three elements of an informal claim: "First, an informal claim must provide the Commissioner of the IRS with notice that the taxpayer is asserting a right to a refund. Second, the claim must describe the legal and factual basis for the refund. Finally, an informal claim must have some written component." *New England Elec. Sys. v. United States,* 32 Fed. Cl. 636, 641-42 (Fed. Cl. 1995) (italics in original; citations omitted). The written component of an informal claim can be satisfied by a writing made either by the taxpayer, or by IRS personnel. *Id.* at 643-44. It does not have to specifically request a refund of a sum certain, describe the tax years for which the refund is requested, or contain a description of the legal basis for the claim. *Id.* at 644. "While the informal claim, as a whole, must elicit these notice requirements, the written component alone does not necessarily have to be the source." *Id.* at 644 (citation omitted). As stated by the Court of Federal Claims:

> The written component should not be considered in a vacuum. Its adequacy must be determined in light of the particular facts and circumstances of the case at issue. As was stated in *American Radiator*:

> the writing should not be given a crabbed or literal
> reading, ignoring all the surrounding circumstances
> which give it body and content. The focus is on the
> claim as a whole, not merely the written component.
>
> Moreover, the "formality or specificity" required of a taxpayer's
> written component is reduced when the actual knowledge obtained
> by a revenue agent during an audit is detailed.

*Id.* at 644 (citations omitted). A taxpayer "can properly rely on the very specific knowledge

gained by the revenue agent in auditing its returns . . . ." *Id.* at 645 (quoting *American Radiator*

*& Standard Sanitary Corp. v. United States,* 318 F.2d 915, 921 (1963)); s*ee Kidde Industries,*

*Inc. v. United States,* 40 Fed. Cl. 42, 62, 64-66 (1997) (allowing informal claim submitted to IRS

auditors verbally with supporting documents, where taxpayer had a cooperative relationship with

the auditor).

AmBase's disaffiliation election extension requests, its letter of April 28, 1997, and the

IRS's own internal documents, are the written component of AmBase's informal claim. The

legal and factual basis for the claim, and AmBase's assertion of its right to a refund, were well

known to the IRS and presented in writing and orally to the IRS on numerous occasions.

**D.     There is no variance between AmBase's claims in this litigation and its
        protective refund claims.**

Defendant asserts that the June 1995 protective claim did not raise the issues in this

litigation because it did not refer specifically to bad debts. But, Defendant ignores that the 1995

protective claim specifically refers to a potential carryback that may be available from 1992 after

the audit for that year was completed. And, the IRS was well aware that the major issue in that

audit was New Carteret's inclusion in the consolidated income tax return for 1992 and the bad

debt reserve. LR56 ¶ 97; Ex. M, p. AMB-TX-001479. Defendant also skips over the fact that

there is no variance with respect to FDIC's protective claim and AmBase's informal claim.

These claims specifically covered a carryback from 1992 relating to New Carteret's inclusion in the consolidated income tax return for 1992, and, such inclusion **required** a redetermination of the bad debt reserve.

Once it is determined that the bad debt reserve was required to be recomputed, AmBase's decision to claim a different amount of deduction for bad debts from its original return was not a new issue, but merely "a mechanical or mathematical adjustment." *The Home Group*, 91 T.C. at 268-71. As the Tax Court noted in AmBase's prior litigation in *The Home Group,* when the taxpayer is not able to determine the maximum amount of the deductible reserve until unrelated issues are resolved, it is not a new matter to adjust the bad debt reserve deduction to reflect the changed circumstances.

Defendant argues that the IRS's internal documents indicate merely that AmBase intended to file an amended return in the future and that this is not the same as making a present informal claim. This same argument was rejected by the Supreme Court in *United States v. Kales,* 314 U.S. at 196. In that case, the Court noted that where the right to a refund is contingent on future events: "The statement that upon the happening of the contingency the claim will be prosecuted is not inconsistent with the present assertion of it." *Id.* at 195-96. The Court went on to conclude on facts analogous to AmBase's that a valid informal refund claim had been filed by the taxpayer.

### E. AmBase's protective claims were perfected by its March 2000 claim.

Even if it is assumed that AmBase's three protective claims were imperfect, any imperfection was remedied in March 2000 when AmBase filed its formal refund claim. It is well-established that a timely refund claim may be perfected by a formal claim filed after the expiration of the limitations period, as long as the IRS has not issued a notice of disallowance

before the formal claim is filed. "[A] notice fairly advising the Commissioner of the nature of the taxpayer's claim, which the Commissioner could reject because too general or because it does not comply with formal requirements of the statute and regulations, will nevertheless be treated as a claim *where formal defects and lack of specificity have been remedied by amendment filed after the lapse of the statutory period.*" *Id.* at 194 (emphasis added; citations omitted); s*ee American Radiator*, 318 F.2d at 921 ("An informal claim which is *partially informative* may be treated as valid even though 'too general' or suffering from a 'lack of specificity' – at least where those defects have been remedied by a formal claim filed after the lapse of the statutory period but before the rejection of the informal request.") (emphasis added; citation omitted). Here, AmBase's protective claims advised the IRS of the "nature of taxpayer's claim" and, if not wholly sufficient, were at least "partially informative." AmBase had the right to perfect these claims because they had never been disallowed by the IRS under 26 U.S.C. § 6532(a)(1).

###### F. Defendant's motion on the three-year statute is premature.

AmBase believes that the current record fully supports its assertion that it timely filed refund claims under both the seven-year statute of limitations for bad debts in 26 U.S.C. § 6511(d)(1) and the three-year statute of limitations in 26 U.S.C. § 6511(a). However, if it is determined that the record is insufficient to support AmBase's position on the three-year statute issue, AmBase is entitled to discovery. This discovery will further establish that actual protective claims for refund were filed with the IRS, both formally and informally. In addition to the responses to written discovery on these issues that are the subject of the motion to compel, AmBase is entitled to follow-up this discovery, e.g., with depositions of IRS employees to

determine what their understanding of AmBase's claims were and what documents were submitted to them (and when the documents were submitted).[17]

## **CONCLUSION**

For the reasons stated above, Defendant's motion to dismiss should be denied and AmBase's motion for partial summary judgment granted.

Respectfully submitted,

/s/ Peter H. Winslow
PETER H. WINSLOW [phv02676]
Scribner Hall & Thompson, LLP
1875 Eye Street, N.W., Suite 1050
Washington, D.C. 20006
Telephone:  (202) 331-8585
Facsimile: (202) 331-2032
E-mail: pwinslow@scribnerhall.com

SAMUEL A. MITCHELL [phv02675]
Scribner Hall & Thompson, LLP
1875 Eye Street, N.W., Suite 1050
Washington, D.C. 20006
Telephone:  (202) 331-8585
Facsimile: (202) 331-2032
Email: smitchell@scribnerhall.com

---

[17] This discovery will not be necessary, and AmBase's Motion to Compel Discovery will be moot, if the Court determines that AmBase's refund claim was timely filed within the seven-year statute of limitations.

CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2009, a copy of the foregoing PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

I further certify that on October 19, 2009, I mailed a paper courtesy copy of the foregoing PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT to the Court at the address listed below, as required by the Court's Electronic Filing Order (Doc. Ent. 3):

> The Honorable Warren W. Eginton
> Senior United States District Judge
> District of Connecticut
> Brien McMahon Federal Building
> United States Courthouse
> 915 Lafayette Boulevard - Suite 335
> Bridgeport, Connecticut 06604

> /s/ Peter H. Winslow
> PETER H. WINSLOW [phv02676]
> Scribner Hall & Thompson, LLP
> 1875 Eye Street, N.W., Suite 1050
> Washington, D.C. 20006
> Telephone: (202) 331-8585
> Facsimile: (202) 331-2032
> E-mail: pwinslow@scribnerhall.com