UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| AMBASE CORPORATION, : | |
|     Plaintiff, : | |
| : | No. 3:08-cv-651-WWE |
| v. : | |
| : | |
| UNITED STATES OF AMERICA : | |
| : | |
|     Defendant. : | |

**MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Ambase Corporation ("AmBase") has brought this action seeking a refund of Federal income tax for the tax year 1989. This refund would result from an increased net operating loss ("NOL") deduction carried back to 1989 under 26 U.S.C. § 172 from Ambase's income tax return from 1992. Plaintiff has moved for partial summary judgment. Plaintiff argues that it is entitled to increase its bad debt reserves because of its amended tax return. Plaintiff also denies having additional unreported income from 1992. For the following reasons, the motion will be granted in part and denied in part.

**BACKGROUND**

Carteret was one of the largest saving and loan associations in New Jersey, and was the 19th largest savings and loan association in the country. AmBase acquired Carteret in 1988. On December 4, 1992, the Office of Thrift Supervision ("OTS") seized Carteret and placed it into conservatorship with the Resolution Trust Corporation ("RTC") for its failure to satisfy capital requirements under the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA").

In August 1993, after the seizure, AmBase filed its consolidated income tax return for tax year 1992. In that return, AmBase reported the activities of Carteret for the period starting January 1, 1992 through December 4, 1992 (OTS seized Carteret on December 4, 1992). The return did not include the activity of Carteret during the period it was seized and included a statement, pursuant to 26 C.F.R. § 1.597-4(g), that elected to exclude the activities of Carteret for the period that it was seized by the OTS.

Ambase received an extension from the IRS to defer its final decision whether to disaffiliate until April 30, 1997. Disaffiliation would prevent Carteret's activities from December 5, 1992 through December 31, 1992 from affecting Ambase's tax obligations. By letter dated April 28, 1997, AmBase elected not to disaffiliate Carteret for the 1992 tax year and informed the IRS that an amended claim would be forthcoming.

In March 2000, AmBase filed a formal claim for tax refund that related back to the 1992 tax year. The claim addresses bad debts on Carteret's books and whether AmBase, after electing not to disaffiliate, could adjust its bad debt reserve for 1992. Plaintiff argues that it should be entitled to increase its bad debt reserve for 1992 and that this increase results in a net operating loss for 1992 that may be carried back to tax year 1989 to generate a tax refund. Defendant contends that despite plaintiff's amended claim, plaintiff may not increase its bad debt reserve retroactively.

## DISCUSSION

A motion for summary judgment must be granted if the pleadings, discovery materials before the court and any affidavits show that there is no genuine issue as to any material fact and

2

it is clear that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A dispute regarding a material fact is genuine if there is sufficient evidence that a reasonable jury could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute.  Am. Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate.  Celotex Corp., 477 U.S. at 323.  If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met.  Liberty Lobby, 477 U.S. at 24.  The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for him.  See Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the court resolves all ambiguities and draws all permissible factual inferences in favor of the nonmoving party.  See Patterson v. County of Oneida, 375 F.3d 206, 218 (2d Cir. 2004).  If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper.  See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

## BAD DEBTS - THE RESERVE METHOD

Section 166 of the Internal Revenue Code allows taxpayers to take deductions for bad debts, defined as debts that become worthless within the taxable year. Taxpayers applying this section may use the "charge-off" or "direct write off" method, whereby the actual amount of uncollectible accounts is deducted from revenue in the accounting period in which they are determined to be uncollectible.

Banks, as defined by sections 585 and 593 of the Internal Revenue Code, are permitted to use an alternative "reserve" or "allowance" method of deducting bad debts. A taxpayer such as Ambase, who utilizes the reserve method, estimates the additional amount of debts held by the taxpayer that are expected to become worthless in the future. The Internal Revenue Code prescribes three techniques available for calculating this estimated bad debt. The computation sets the maximum possible addition to bad debt reserves a taxpayer may claim. However, a taxpayer may choose to increase its bad debt reserves by any amount under this statutory ceiling. Importantly, the increase in bad debt reserves determines the deduction available to the taxpayer.

The bad debt deduction computation in AmBase's original 1992 return reflected a maximum bad debt reserve addition of $101,555,414. However, Ambase elected to increase its bad debt reserve by only $56,005,961.

The maximum bad debt reserve addition as calculated in plaintiff's amended 2000 claim was $125,253,834. Plaintiff has sought to increase its reserve retroactively from the original $56,005,961 to the new maximum of $125,253,834, a difference of $69,247,873. This increase would give plaintiff a net operating loss for the tax year 1992, which plaintiff wishes to carry back to the tax year 1989. Plaintiff is claiming a tax refund from 1989 because the net operating

loss would reduce plaintiff's income for that year.

### TREASURY REGULATIONS

In Home Group, Inc. v. C.I.R., the Tax Court found that Treasury regulations promulgated under section 7805 of the Internal Revenue Code were considered "interpretive." 91 T.C. 265, 272 (1988).  There, the court invalidated a sentence contained in a Treasury regulation applicable before 1970.[1]  That regulation would have prevented taxpayers from retroactively decreasing their bad debt reserves.  When Home Group was decided, the authoritative weight of a final Treasury regulation and the judicial deference to such regulation depended on whether the regulation was considered legislative or interpretive.  The Tax Court declined to defer to the Treasury regulation, in large part because of its interpretive status.  The court found that section 593 of the Internal Revenue Code granted wide latitude to taxpayers to decide the amount of bad debt reserves they wished to claim and that the regulation at issue did not harmonize with the origin and purpose of the statute.  Home Group, 91 T.C. at 273.

In the twenty years since the Home Group decision, the administrative landscape has changed significantly.  Recognizing this, the Supreme Court recently discarded the standard of review that was applied to interpretive tax regulations when Home Group was decided.  Mayo Foundation for Medical Educ. and Research v. U.S., 131 S. Ct. 704, 713 (2011).  Interpretive tax regulations are now examined under the *Chevron* standard previously applied only to legislative regulations.  See Chevron U.S.A Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837,

---

[1] 26 C.F.R. § 1.593-6(a)(3) was applicable to Pre-1970 additions to reserve for losses on qualifying real property loans.

842-43 (1984). Chief Justice John Roberts explained the rationale for *Chevron* being the appropriate standard of review for analyzing interpretive Treasury Regulations:

> The principles underlying our decision in *Chevron* apply with full force in the tax context . . . Filling in gaps in the Internal Revenue Code plainly requires the Treasury Department to make interpretive choices for statutory implementation at least as complex as the ones other agencies must make in administering their statutes . . . We see no reason why our review of tax regulations should not be guided by agency expertise pursuant to *Chevron* to the same extent as our review of other regulations. Mayo Foundation, 131 S. Ct. at 713.

The first step of the two-part framework announced in *Chevron* asks whether Congress has "directly addressed the precise question at issue." Chevron, 467 U.S. at 843-43. Here the question deals with defining the boundaries of retroactive bad debt reserve adjustment based on income tax return adjustments. Congress has not directly addressed this issue through section 593 or otherwise. This leads us inexorably to *Chevron* step two, under which we may not disturb an agency rule unless it is "arbitrary or capricious in substance, or manifestly contrary to the statute." United States v. Mead Corp., 533 U.S. 218, 227 (2001). At step two, the sole question for the Court under the *Chevron* analysis is "whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 843. The bad debt adjustment rules as articulated in §§ 1.593-5(b)(2) and 1.593-6A(a)(1) are a "reasonable interpretation" of the enacted text. Thus, the regulations easily satisfy the second step of *Chevron*.

APPLICATION OF §§ 1.593-5(b)(2) and 1.593-6A(a)(1)

In reliance upon 26 C.F.R. §§ 1.593-5(b)(2) and 1.593-6A(a)(1), plaintiff argues "the regulations are explicit that Ambase is entitled to claim the maximum bad debt deduction on an

6

amended return." For the following reasons, plaintiff's interpretation of the regulations is imprecise.

Code section 593(b) provides three methods that may be elected by a savings and loan association for purposes of Code section 166(c) to determine the reasonable addition to its reserve for bad debts:

> (1) The percentage of taxable income method described in Code § 593(b)(2);
>
> (2) The percentage of qualifying real property loans method described in Code §§ 593(b)(3) and 585(b)(2); and
>
> (3) The experience method set forth in Code §§ 593(b)(4) and 585(b)(3).

As Revenue Ruing 79-123 makes clear, section 1.593-6A(a)(1) simply allows a taxpayer the freedom to choose any of the three above methods in the case of an adjustment described in section 1.593-5(b)(2):

> Section 1.593-6A(a)(1) of the Income Tax Regulations provides that the use of a particular *method* for computing the bad debt reserve addition in the return for the taxable year is not a binding election to apply such *method* either for such taxable year or for subsequent years. Thus, in the case of a subsequent adjustment described in paragraph (b)(2) of section 1.593-5 which has the effect of permitting an increase, or requiring a reduction, in the amount claimed in the return for a taxable year as an addition to the reserve for losses on qualifying real property loans, the amount of such addition may be recomputed under whichever *method* the taxpayer selects for the purpose of such recomputation, irrespective of the *method* initially applied for such taxable year. Rev. Rul. 79-123, 1979-1 C.B. 215, 1979 WL 50842 (emphasis supplied).

Section 1.593-6A(a)(1) only explicitly allows a change in computation method; however, a change in method is likely to alter the resulting bad debt computation. Importantly, the purpose of the computation is to establish the maximum bad debt reserve addition available to a taxpayer.

As demonstrated below, this ceiling may or may not be relevant to subsequent income tax return adjustments.

Section 1.593-5(b)(2) describes subsequent adjustments:

> If an adjustment with respect to the income tax return for a taxable year is made, and if such adjustment (whether initiated by the taxpayer or the Commissioner) has the effect of *permitting an increase, or requiring a reduction*, in the amount claimed on such return as an addition to the reserve for losses on nonqualifying loans or to the reserve for losses on qualifying real property loans, then the amount initially credited to such reserve for such year . . . may have to be increased or decreased, as the case may be, *to the extent necessary to reflect such adjustment*.  (emphasis supplied).

A literal reading of Treas. Reg. §§ 1.593-5(b)(2) and 1.593-6(a) would support the view that a savings and loan association cannot increase its deductible addition to a reserve for losses on qualifying real property loans unless it originally claimed the maximum amount allowable under any of the methods provided by Code section 593(b) and, further, unless a subsequent adjustment resulted in an increase in the permissible maximum.  This is true because for an adjustment to permit an increase in the amount claimed, the initial amount claimed necessarily needed to be the maximum amount allowable.  On the other hand, a reduction in the amount claimed would be required any time the new maximum was lower than the original amount claimed.  Even the IRS has backed away from this literal interpretation and agreed that Treasury regulation §§ 1.593-5(b)(2) and 1.593-6(a) should be accorded a more liberal interpretation. GCM 33820, 1968 WL 16122.

In Revenue Ruling 70-5, the Service concluded pursuant to the provisions of Treasury regulation §§ 1.593-5(b)(2) and 1.593-6(a) that the taxpayer may increase its addition to its

8

reserve for losses on qualifying real property loans *in an amount sufficient to offset taxable income* as redetermined by the subsequent adjustment.  This conclusion is consistent with the idea that it is reasonable to permit the taxpayer to adjust its reserve for bad debts in an amount necessary to offset increases in taxable income in those situations where the taxpayer has manifested an intent to claim a bad debt reserve sufficient to offset its entire taxable income.  Such an objective standard would prevent the taxpayer from arbitrarily adjusting the reserve for bad debts to suit its own purposes.

   Treasury regulation § 1.593-5(b)(2) was intended to authorize a retroactive reserve addition when necessary in order to place the taxpayer in the same position after the adjustment as it was prior to the adjustment.  This result is suggested by the language of the regulation: " . . . to the extent necessary to reflect such adjustment."  In the present case, the plaintiff taxpayer can be placed in the same position after the adjustment as it was before the adjustment only by permitting it to deduct a reserve addition retroactively in an amount necessary to offset any upward adjustment in income.

   Defendant has argued that a taxpayer should not be able to make any retroactive changes to its bad debt reserves based on the holding in  Rio Grande Bldg. & Loan Ass'n v. C.I.R.  36 T.C. 657, 668 (1961).  The facts presented in that case are distinguishable from those in the present case as there was no income adjustment in Rio Grande.   The opinion in that case was not a conclusion by the Tax Court that a retroactive reserve increase is not permissible in cases when a subsequent adjustment provision in the regulations is applicable.

   Revenue Ruling 70-5 clearly sets forth a construction of Treasury regulation § 1.593-5(b)(2) that, when a subsequent adjustment to taxable income has been made, the amount

9

originally claimed as a deduction for a reserve addition under Code section 593(b) is not a binding election. Furthermore, by restricting the retroactive increase to an amount necessary to offset the adjustment, an objective standard is imposed that prevents the taxpayer from arbitrarily claiming retroactive increases to its own advantage.

Accordingly, the plaintiff may increase its addition to its reserve for losses in an amount necessary to offset any net increase in taxable income, as redetermined, as a result of the subsequent adjustment to the its federal income tax return. Plaintiff's motion for entitlement to increase its bad debt deduction for 1992 will be granted. However, plaintiff's motion for entitlement to increase its bad debt deduction to the amended maximum computation will be denied.

ADDITIONAL TAXABLE INCOME FOR 1992

Plaintiff has not omitted $31,506,486 in gross income from its return attributable to Carteret's December 1992 activity. Plaintiff's 2000 amended return on Form 1120x shows that AmBase increased its consolidated gross income by that amount.

Carteret did not have taxable Federal Financial Assistance ("FFA") that plaintiff omitted from its 1992 return. Defendant does not contest this issue in its opposition to plaintiffs motion for summary judgment or in its reply in support of its cross motion for summary judgment. In addition, defendant admits that Mr. Vortriede, a government expert regarding the calculation of FFA, specifically stated that Carteret has no taxable FFA for 1992.

Therefore, plaintiff's motion for partial summary judgment that plaintiff has not failed to list income on its amended 1992 return will be granted.

## **CONCLUSION**

For the foregoing reasons, the plaintiff's motion for partial summary judgment will be GRANTED in part and DENIED in part. Plaintiff is entitled to amend its bad debt deduction. However, any additional bad debt deduction is limited to an amount necessary to offset any net increase in taxable income resulting from the adjustment to plaintiff's federal income tax return. Plaintiff did not fail to list income on its amended 1992 return.

DATED this 28th day of November, 2011 at Bridgeport, Connecticut.

_____/s/_____
WARREN W. EGINTON
SENIOR UNITED STATES DISTRICT JUDGE